**SOUTH, INC., as owner of THE VEGA, Libellant-Appellant,**

v.

**MORAN TOWING AND TRANSPORTATION CO., Inc., TUG CHRISTINE MORAN, her engines, etc., Respondents-Appellees,**

**and**

**Tug Claire A. Moran, Inc., Claimant-Appellee.**

**MORAN TOWING AND TRANSPORTATION CO., Inc., Cross-Libellant-Appellee,**

v.

**SOUTH, INC., Cross-Respondent-Appellant.**

**Nos. 302, 303, Dockets 30128, 30129.**

United States Court of Appeals
Second Circuit.

Argued March 29, 1966.

Decided May 27, 1966.

---

Timothy P. Walsh, New York City (Hardin, Hess & Eder, New York City, on the brief), for libellant-appellant and cross-respondent-appellant.

Eugene Underwood, New York City (Randolph W. Taylor, New York City, and Burlingham, Underwood, Barron, Wright & White, New York City, on the brief), for respondents-appellees and cross-libellant-appellee.

Before MOORE, FRIENDLY and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

On January 9, 1961 Moran Towing and Transportation Co., Inc., one of the respondents, and South, Inc., the libellant, entered into a contract which provided for the towing by Moran in a single tow of three identical ferries, the Vega, the Deneb and the Altair, owned by South, Inc., from New York to Norfolk, Virginia. South, Inc. agreed to outfit the ferries with lights and other equipment in a proper and sufficient manner, and it indemnified Moran against any loss or damage Moran might suffer by reason of the unseaworthiness of the tow. Prior to the voyage the Vega was inspected by a surveyor who recommended that she be put into drydock for inspection, because of some observed pitting of the 3/16 inch plating of the welded hull. The owner of the Vega did not comply with this suggestion, and as a result was unable to procure insurance. The surveyor's other recommendations concerning the proper outfitting of the ferries were adopted. The master of the Tug Christine Moran also boarded the Vega for the purpose of making an inspection, but at that time all deck openings had been firmly secured and he was unable to inspect the vessel's interior.

The tow convoy started out at about midnight, January 10, 1961, and proceeded southward along the Jersey coast at a speed which varied from 0 to 7 knots. The ferries were unmanned. The coast-wise trip was uneventful until about 4:30 a.m. when the Tug's first mate noticed that the port, starboard and stern running lights on the Vega, the lead ferry, were no longer visible. These lights were individually and separately battery powered. While this was being reported to the Captain, the Vega was picked up and observed on the radar scope. The record also shows that in order to confirm the radar sighting, the Captain turned the Tug about until she came abreast of the Vega where, about six hundred feet west of her, the silhouette of the ferry was seen by the light of the moon, which was rising in the east. The Vega was riding upright, as high as before, and the outline of her superstructure showed nothing out of the ordinary. The Captain of the Tug did not know why the lights had failed, but he concluded that the Vega was not in any danger. He was of the opinion that he could safely proceed because the lights on the other two ferries were functioning properly. He made no effort to replace or repair the Vega's lights because the overhang of the ferry made it extremely hazardous for the crewmen to attempt to board the Vega from a small boat. The Tug was turned back to its original course and, after slowly straightening out the tow, gradually increased speed to a maximum of 7 knots. Shortly thereafter, when there had been no reduction in engine speed, it was observed that the Tug was stopped dead in the water. The Vega no longer showed on the radar scope. The Tug then backed, while about nine hundred feet of the twelve hundred foot hawser between its stern and the Vega was taken in. From this closer position those on the Tug discovered that the Vega had capsized and only three or four feet of the ferry's bottom showed above water. No hull damage was observed. The Coast Guard was notified and a cutter stood by while the Tug attempted to take the tow toward the New Jersey shore and shallower water. On the way, however, the Vega went to the bottom and the hawsers had to be cut. Both the Captain of the Tug and the Coast Guard took bearings and

determined the fix of the position where the ferry sank. Neither the Tug nor the cutter had any equipment for placing a marker buoy at the spot and the Vega has never been located. The Tug towed the other two ferries back to New York. An inspection disclosed that they had suffered no damage and apparently had shipped no seas as shavings remained on their decks from the outfitting work done prior to departure.

Both at the trial below and on this appeal the libellant-appellant has claimed that the Tug failed in its duty to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service and it has specifically charged that the Vega was over-towed. The trial court, however, found that under the circumstances the conduct of the Tug was consistent with the exercise of due care and skill and that the libellant had failed to show that the Tug had towed the Vega at an excessive speed. The court also concluded that the Vega was unseaworthy. It, therefore, entered a decree dismissing the libel and granted a decree in favor of Moran Towing and Transportation Co., Inc. on its cross-libel to recover for the loss of its towing gear. We affirm.

██ The fact that the tow appeared to be in good order when delivered to the Tug and yet suffered damage before reaching its destination does not in itself raise a presumption of negligence; and this is so even where the tow was, as here, unmanned. Neither the Tug nor its owner is a bailee or an insurer. Stevens v. The White City, 285 U.S. 195, 200–201, 52 S.Ct. 347, 76 L.Ed. 699 (1932). In that case the Supreme Court said, at page 201, 52 S.Ct. at page 349,

"It has long been settled that suit by the owner of a tow against her tug to recover for an injury to the tow caused by negligence on the part of the tug is a suit *ex delicto* and not *ex contractu*."

And at page 202, 52 S.Ct. at page 350,

"While respondent was not an insurer or liable as a common carrier, it owed to the owner of the Drifter the duty to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service. The burden was upon petitioner to show that the loss for which he sought recovery was caused by a breach of that duty. The mere fact that the Drifter was in good order when received by respondent and in damaged condition when delivered does not raise any presumption of fault."

*The White City* case also holds that the burden of proof in showing negligence on the part of the tug rests upon the libellant tow throughout the trial; and a showing that certain facts of the case or the causes of the loss are peculiarly within the knowledge of the respondents is immaterial.

██ Moreover, there is a presumption that a vessel which is lost under normal conditions, with fair weather and calm seas, as was the case here, was unseaworthy in the absence of proof that she was improperly handled. See Frederick Snare Corp. v. Moran Towing & Transportation Co., 195 F.Supp. 639, at 642 (S.D.N.Y.1961); cf. Metropolitan Coal Co. v. Howard, 155 F.2d 780 (2d Cir. 1946); Commercial Molasses Corp. v. New York Tank Barge Corp., 114 F.2d 248 (2d Cir. 1940), aff'd 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89 (1941). It is also settled that the owner of a tow is responsible for its seaworthiness and warrants that she is " * * * sufficiently staunch and strong to withstand the ordinary perils to be encountered on the voyage." The Edmund L. Levy, 128 F. 683, at 684 (2d Cir. 1904); Frederick Snare Corp. v. Moran Towing & Transportation Co., supra, 195 F.Supp. at 644. In the present case the trial court found that the appellant's efforts to overcome this presumption and sustain its burden of proof were not persuasive and concluded that the Vega was unseaworthy.

██ The appellant, however, claims that the Tug was negligent in not making a thorough on board inspection of the ferry and in proceeding on its course

after discovering that all three of the Vega's running lights were out. It argues that these circumstances bring the case within the holding in Sternberg Dredging Co. v. Moran Towing & Transportation Co., 196 F.2d 1002 (2d Cir. 1952) in which this court enunciated the principle that, where evidence has been adduced revealing circumstances under which, in the exercise of reasonable care and maritime skill, the tug is under a duty to inspect and fails to do so, it can escape liability for its negligence only by proving that the failure to inspect was not the cause of the disaster. This is not contrary to the Supreme Court's decision in *The White City*. The burden of proof is on the libellant tow to show that the tug was negligent. Under certain circumstances a failure to inquire or inspect constitutes negligence. If the libellant has shown such circumstances and such failure, and if the tug has not produced evidence sufficiently persuasive to show that the failure to inquire or inspect did not cause the disaster to the tow, then the libellant tow has sustained its burden of proof.

▆▆ However, the duty to inquire and the quality, kind and scope of an inspection vary with the circumstances of each case. The test is whether or not, in the light of the circumstances with which the respondents were confronted, they "exercised such reasonable care and maritime skill as prudent navigators employ for the performance of similar service." This principle imposed upon the respondents the duty to meet the *reasonably foreseeable* danger implicit in the situation with the degree of care and skill that a prudent navigator would exercise under the same circumstances.

▆ In *Sternberg* the court was convinced that the respondent undoubtedly had knowledge that the dredge which it was towing had a perceptible list about three hours before it sank and that this knowledge placed upon the respondent a duty of inquiry, the disregard of which constituted negligence. The reason for this is that a list is fairly conclusive evidence of a shifting of ballast or cargo or a taking of water, either of which is likely to result eventually in the foundering of the vessel. *Sternberg* goes on to say that such a showing of negligence places upon the respondent the burden of proving that the subsequent foundering of the vessel was not caused by its failure to act. In the present case the only knowledge which came to the Tug's attention was that the lights had gone out. Even though it knew that these lights were separately powered, their failure was not likely to have been caused by anything which would eventually lead to the sinking of the vessel. The Tug's duty to inquire and inspect under the circumstances extended no further than to check on the ferry's position with relation to the water and how it was riding. It, therefore, met and fulfilled its duty to inquire and inspect. The result of this examination, which revealed nothing, gave the Tug no reason whatever to foresee danger and disaster for the Vega. Certainly there is no basis for holding that the trial court committed error in deciding this issue as it did.

▆ The appellant also claims that the sinking of the Vega was caused by over-towing by the Tug. The court below on substantial evidence found that this assertion was not proven. On this issue the court was, for the most part, faced with the conflicting testimony of experts for the contestants. There was proof which showed that the other ferries in the tow were undamaged. Ganley, an expert on towing, testified that a speed of 8 knots would not have been excessive. And it was disclosed that the three ferries operated at 8 knots when running on their own power. The trial court was entitled to disregard the testimony of libellant's witness, the surveyor Ferenczy, who said that " * * * based perhaps on sixth sense * * * " he concluded, after eliminating a number of possible causes, that " * * * it was overtowed. That's the only reason left." We find no error in the trial court's disposition of this issue.

▆ With regard to the respondent Moran Towing and Transportation Co.,

Inc.'s cross-libel for the loss of its towing gear, we also affirm the judgment of the district court. The Vega was found to have been unseaworthy and sank for that reason. There is no dispute that the gear was lost as a result of the sinking, and the contract between the parties provided that under those circumstances the libellant was bound to indemnify Moran for its loss. The fact that no marker buoy was placed at the point where the Vega went to the bottom does not, in the situation presented, relieve the libellant of that responsibility. A fix was taken both by the United States Coast Guard and the Captain of the Tug, and still the hulk could not be located. There is nothing that would indicate that a marker buoy would have produced a better result.

The decree of the court below on the libel and cross-libel is affirmed.