289 So.2d 864 (1974)
Wallace C. WALKER
v.
The TRAVELERS INDEMNITY COMPANY.
No. 6021.
Court of Appeal of Louisiana, Fourth Circuit.
February 6, 1974.
*867 Arthur A. De La Houssaye, Charles J. Rivet, New Orleans, for plaintiff-appellee.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre, John O. Charrier, Jr., New Orleans, for defendant-appellant.
Before GULOTTA, SCHOTT and MORIAL, JJ.
MORIAL, Judge.
We must decide if a yacht (marine) insurance policy covered the loss of the yacht "Bon Conge". Was the cause of the sinking due to a latent defect or unseaworthiness? The trial court found that the loss was the result of a latent defect and rendered judgment for the plaintiff for $8,609.00.
The "Bon Conge" was insured under Yacht Policy No. MYA 1783200 of Travelers Indemnity Company for the period July 1, 1969 to July 1, 1970. The Policy was issued through and signed by George S. Kausler, Limited, an agent of Travelers Indemnity Company.
On January 25, 1970, the plaintiff, Wallace C. Walker, was notified that the "Bon Conge" sunk at its moorings in Boathouse No. 11 at the New Orleans Marina at West End. He immediately went to the marina and found the "Bon Conge" submerged in ten feet of water; the plaintiff promptly contacted P. T. Baumgartner (Bumgardner) of George S. Kausler, Limited. Baumgartner (Bumgardner) met the plaintiff at the marina and told him the loss was covered. He advised the plaintiff to file a claim, have the boat repaired and keep a running tally of repair costs.
The sinking was caused from water entering the yacht through a hole in the bottom of the muffler, or "maxim silencer" as it is referred to in the record, which was partially concealed in its location in the engine room. This is not disputed.

POLICY
The pertinent provisions of the insurance policy under which the plaintiff claims are:
"Section AHull Insurance
"WHERE COVERED:In part and at sea, under power or sail, in docks and graving docks, and on ways, gridirons, pontoons, and on shore. With leave to sail with or without pilots, to tow and assist vessels or craft in all situations, and to be towed and to go on trial trips.
"PROPERTY COVERED:Hull, Spars, Sails, Tackle, Apparel, Machinery, Boats and other furniture of an in yacht hereby insured. * * *"
"EQUIPMENT ON SHORE:It is also agreed that should any part of the furniture, tackle, boats or other property of the said yacht be separated and land up on shore during the life of this Policy, then this Policy shall cover the same to an amount not exceeding 20% of the sum stated in Coverage A, on Page 1. The amount attaching on the said yacht shall be decreased by the amount so covered.
"PERILS INSURED:The insurance provided by this section cover against:
"(a) All risks of physical loss or damage to the property covered from any external cause.
"(b) Physical loss or damage to the property covered directly caused by the following:
(1) Explosions, bursting of boilers, breakage of shafts, or any latent defect *868 in the machinery or hull (excluding the cost and expense of replacing or repairing any defective part;
(2) Negligence of master, mariners, engineers, repairers, or pilots; provided such loss or damage has not resulted from want of due diligence by the owner of the yacht or by the insured."
The defendant contends that the policy by its terms does not cover:
"* * * (a) Any loss, damage or expense caused by wear and tear, gradual deterioration, weathering, moths, vermin, mold, marine life or unseaworthiness."
The policy basically insured against "all risks of physical damage" for a definite period. Therefore, it is a time policy[1] of marine insurance with an all risk[2] provision.
Under the "Perils Insured" provisions in (b)(1) is covered "* * * any latent defect in the machinery or hull * * *", and (b) (2) contains, with almost ritualistic uniformity, the historic Inchmaree Clause.[3] 44 Am.Jur.2d, Insurance, Section 1383.

TESTIMONY
The uncontradicted testimony of the plaintiff was that: he purchased the "Bon Conge" in 1953 and in 1958 it was completely overhauled and outfitted with a new engine, including a new muffler, i. e., "maxim silencer". He was told the life of the muffler was 2500 hours and it should be replaced at the next overhaul of the engine; that the day the "Bon Conge" sank the engine showed 1400 hours. Periodically, mechanics inspected the engine and attendant equipment including the muffler. Once a year George Engine Co. would inspect the yacht. Each year the yacht was hauled from the water by Ouliber Boat Works and inspected from stem to stern. Oulliber had blanket authority to repair the "Bon Conge" or any of its parts anytime Oulliber deemed repairs necessary. Jules Schubert, a marine repairman, would periodically check the engines. At least once a week Jim Thomas, an employee, inspected the engine room, ran the engines and wiped off all parts of the engine including the muffler. Every Saturday he conducted an inspection of the "Bon Conge" which included running the engine, checking the muffler and the bilges and a complete check over. The day before the yacht sank he inspected it and ran the engine for fifteen minutes. (Tr. pp. 13-31)
Two witnesses appeared for the defendant-appellant: a marine surveyor who did *869 not see the muffler, but expressed his opinion from facts provided by counsel for the defendant-appellant that the cause of the hole in the muffler was from rusting out (Tr. p. 146); the other, Manuel Joseph Stroecker (Stroker) a mechanic employed by George Engine Co., who replaced the muffler. He testified that the hole in the muffler was caused by "a wasting away or deterioration". (Tr. p. 110) Stroecker (Stroker) threw the "old" muffler away when he replaced it. When shown Plaintiff's Exhibit No. 5, that had previously been identified as the replacement muffler (Tr. p. 83), he could not identify it. (Tr. pp. 110-111)

LAW GOVERNING INTERPRETATION OF POLICY
We find that the policy is one of marine insurance and a maritime contract, though not within the exclusive admiralty and maritime jurisdiction of the United States courts. Insurance Company v. Dunham, 78 U.S. (11 Wall.) 1, 20 L.Ed. 90 (1870); Kossick v. United Fruit Co., 365 U.S. 731, 735, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961).
The interpretation and application of the policy terms are to be governed by state law. Wilburn Boat Company v. Fireman's Fund Insurance Company, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955); Irwin v. Eagle Star Insurance Company, Ltd., 455 F.2d 827, (5th Cir. 1972). However, to interpret the disputed clause and the law applicable, we rely on general maritime law which governs policies of marine insurance. Anders v. Poland, 181 So.2d 879 (La.App. 4th Cir. 1966).
In determining the meaning of the terms of the policy we are guided by what was said in Henjes v. Aetna Ins. Co., 132 F.2d 715, 719 (2d Cir. 1943), cert. denied, 319 U.S. 760, 63 S.Ct. 1316, 87 L.Ed. 1711 (1943):
"It is a general rule of construction that where the language of a policy of insurance may reasonably be construed in more than one way the meaning beneficial to the insured is to be given effect by resolving fair doubts against the insurer who chose the language which created them. Ashenbrenner [Aschenbrenner] v. United States F. & G. Co., 292 U.S. 80, 54 S.Ct. 590, 78 L.Ed. 1137; DeHart v. Illinois Casualty Co., 7 Cir., 116 F.2d 685. That is particularly applicable to a time policy of marine insurance."

LATENT DEFECT
Our court first defined latent defect in 1943 as follows:
"A latent defect is a hidden defect and generally involves the material out of which the thing is constructed." Ross v. Tynes, et al., 14 So.2d 80, 83 (Orl.App. 1943).
This definition was later applied in Schon v. James, 28 So.2d 531 (Orl.App.1946), and since has been sanctioned by other cases in the jurisprudence of Louisiana, none of which involved a marine loss. Our examination of the jurisprudence of other states and federal cases dealing with maritime law reveals that our definition of latent defect that has its origin in Ross v. Tynes, et al., supra, is incomplete.
A latent defect is defined in Black's Law Dictionary, 4th Ed., as a defect which a reasonably careful inspection would not reveal or a defect that could not have been discovered by any known or customary test.
A latent defect is a defect which is not apparent and which would not be discoverable upon reasonable inspection. Zillah Transportation Co. v. Aetna Insurance Co., 175 Minn. 398, 221 N.W. 529 (1928); Reisman v. New Hampshire Fire Insurance Company, 312 F.2d 17. (5th Cir. 1963)
*870 Latent defect means a defect not manifest, but hidden or concealed and not visible or apparent; a defect hidden from knowledge as well as from sight, and specifically a defect which reasonable inspection will not reveal. Glens Falls Ins. Co. v. Long, 195 Va. 177, 77 S.E.2d 457 (1953). See also Reliance Insurance Company v. Brickenkamp, 147 So.2d 200 (Fla.App. 1963); Watson v. Providence Washington Ins. Co., 106 F.Supp. 244, appeal dismissed, 4 Cir., 201 F.2d 736.
From the foregoing we are compelled to conclude that a necessary element is not present in the Louisiana jurisprudential definition of latent defect. That necessary element is that to be latent a defect must not have been discoverable upon a reasonable inspection. We restrict the definition of "latent defect" in Ross v. Tynes, et. al., supra, to the facts of the cases where it has been cited. A classic definition of latent defect is found at 26A C.J.S. Defect p. 133.[4] Accordingly, we deem a proper definition of latent defect to be a defect that is hidden or concealed from knowledge as well as from sight and which a reasonable customary inspection would not reveal.
The defect was certainly latent. The hole in the "maxim silencer" could not be discovered because of the partially concealed location of the "maxim silencer" in the engine room of the "Bon Conge".
The fact that this record stands uncontradicted that the "Bon Conge", just the day before it sank, was in good shape clearly demonstrates that the "maxim silencer" sprung the leak. There is no basis for concluding that the defect could have been discovered.
If the matter is approached from the viewpoint that the owner, without the benefit of any presumptions must affirmatively establish that the particular defect was latent within the classic meaning of the term, the result is the same. Since the insurer's assertion of unseaworthiness is, in fact, a claim that the "maxim silencer" was defective, it was either latent or not latent. If it was not discoverable by known and customary tests, it was latent and covered under the policy. The policy, as is usually the case, did not prescribe any requirement for routine periodic inspections of the yacht, or that the owner obtain any certificate of inspection.
On this record the owner did all that prudence required to ascertain or discover any defect; he did all he could do, yet discovered nothing defective.

SEAWORTHINESS
Defendant-appellant is correct in its contention that when a vessel sinks in calm waters, a presumption arises that the vessel was unseaworthy in some particular. South, Inc. v. Moran Towing Transportation Co., 2 Cir., 360 F.2d 1002; Star Towing Company v. Barge ORG-6504, D.C., 301 F.Supp. 819, 822. An insured can rebut the foregoing presumption by establishing that the vessel was seaworthy before the sinking. Boston Ins. Co. v. Dehydrating Process Co., 1 Cir. 204 F.2d 441. The seaworthiness of the "Bon Conge" before it sank was established by the uncontroverted testimony of the plaintiff.
More important, under the American Rule, unlike the English, there is an implied warranty of seaworthiness in a time policy.[5] A consequence of this is that *871 if the vessel is unseaworthyas the "Bon Conge" was notat the time the insurance attaches, the breach absolutely avoids the policy.[6]

INCHMAREE CLAUSE
The Inchmaree clause in (b)(2) under "Perils Insured" affords coverage of additional perils resulting from "negligence of master, mariners, engineers, repairers, or pilots." (emphasis supplied) Indeed this clause is aid and comfort not to the defendant-insurer, but to the plaintiff-owner. Its object and purpose is to expand coverage and protect the owner for the negligence of his servants. See Note 3, supra.
The only limitation on this coverage is the phrase "* * * provided such loss or damage has not resulted from want of due diligence by the owner of the Yacht or by the insured." This limitation does not impute to the owner on notions of respondeat superior acts of the persons enumerated in the coverage. Saskatchewan Government Insurance Office v. Spot Pack, Inc., supra. This record discloses that the owner was exceedingly diligent.
There is no proof in this record that the defect was discoverable by prudent inspection, or that a prudent inspection could not have revealed it. If the defect was one which in prudence ought to have been discovered, then it was Oulliber Boat Works who should have discovered the condition likely to give rise to a leak. The record is uncontradicted that Oulliber was responsible for the upkeep and maintenance of the yacht and the owner had given Oulliber blanket authority to do anything required to maintain the vessel seaworthy.
Oulliber is in the category of "repairers" under (b)(2) of the "Perils Insured" clause. As such, its failure to carry out its duty to the owner was negligence and, under the Inchmaree clause, this too was specially covered.
If the defect could have been discovered the resulting unseaworthiness was due to the negligence of Oulliber; if it was not discoverable by Oulliber, it was latent. Either way the insurer turns, the loss is within the expanded coverage.
Further, it is well established that where negligence, even on the part of the employees of the insured, causes a loss, that loss is fortuitous and within the coverage of all risks insurance. C. H. Leavell & Company v. Fireman's Fund Insurance Company, 372 F.2d 784 (9th Cir. 1967). Only "wilful misconduct", measuring up to "knavery" or "design" will suffice as a defense to an "all risks" policy of marine insurance. New York, New Haven and Hartford Railroad Company v. Gray, 240 F.2d 460 (2d Cir. 1957), cert. denied 353 U.S. 966, 77 S.Ct. 1050, 1 L.Ed.2d 915 (1957), rehearing denied, 354 U.S. 943, 77 S.Ct. 1397, 1 L.Ed.2d 1541 (1957). This record shows no such conduct on the part of the plaintiff-owner.

BURDEN OF PROOF
Plaintiff's burden of proof under such a policy as here is a light one: to make a prima facie case for recovery he must show only that a loss has occurred. Upon plaintiff's making such a prima facie showing, the burden shifts to the defendant-insurer to prove that the loss arose from a cause which is excepted from the policy or for which it is not liable. Couch on Insurance 2d, Vol. 13, Section 48:139, p. *872 596; Ellzey v. Hardware Mut. Ins., Co. of Minnesota, La.App., 40 So.2d 24; Turner v. Ewing, La.App., 220 So.2d 518, affirmed 255 La. 659, 232 So.2d 486; Myevre v. Continental Casualty Company, La.App., 245 So.2d 785, writ denied 258 La. 764, 247 So.2d 863. Additionally, in this court, it is incumbent on the appellant to show "manifest error" in the factual determination of the trial court before a reversal will be granted. Smith v. Westchester Fire Insurance Company of New York, 227 La. 812, 80 So.2d 418; Pearson v. Taylor, 116 So.2d 833. The defendant-appellant has failed to do both.

DAMAGES
Plaintiff prayed for a judgment in the amount of $11,862.50 and itemized his claim as follows:

Total invoices filed with George S. Kausler
 thru April 24, 1970 ......................$ 8,046.07
Estimate of Jules Schubert Marine Service
 to replace all copper clad gaskets in engine
 damaged by battery acid ................. 250.00
Automobile trips by Wallace C. Walker re
 supervision72 days at 10 mi/day
 total 720 miles at 12¢ ............. 86.40
Repair and recondition galley butane stove
 and lines ............................... 75.00
"Maxim Silencer 4" MUWlinvoice
 #130, Al Epstein, Inc., January 27,
 1970 .................................... 57.75
Supervision by Wallace C. Walker72 days
 at 2½ hours per daytotal 180 hours
 at $10.00 per hour ...................... 1,800.00
Office overhead$10,315.22 at 15% ... 1,547.25
 __________
 TOTAL ..........$11,862.47
Therefore, plaintiff's claim should have been $11,862.47.

The trial judge properly reduced the sum of $8,047.07 invoiced to Kausler by $602.60 for personal effects excluded from coverage in line (d) of the policy "Exclusions." He further correctly reduced plaintiff's claim for supervision by $1,200.00 and his claim for office overhead by $1,247.25. The judgment of the trial court, after having rightfully reduced the corrected claim of the plaintiff, should have been $8,812.62 and not $8,609.90 as was awarded.
The "Perils Insured" provision of the policy in (b)(2) specifically provides for "* * * excluding the costs and expenses of replacing or repairing any defective part." Therefore the amount of $8,812.62 is further reduced by $57.75, the cost of the "maxim silencer".
For the foregoing reasons the judgment of the trial court is amended and affirmed. Accordingly, there is judgment in favor of the plaintiff, Wallace C. Walker, and against the defendant, Travelers Indemnity Company, in the full sum of $8,754.87, plus legal interest from date of judicial demand until paid and for all costs.
Amended and affirmed.
SCHOTT, J., dissents with written reasons.
GULOTTA, J., concurs with written reasons.
SCHOTT, Judge (dissenting with written reasons).
The pertinent provisions of the insurance policy involved in this case are as follows:
"PERILS INSUREDThe insurance provided by this section covers against:
(a) All risks of physical loss or damage to the property covered from any external cause.
(b) Physical loss or damage to the property covered directly caused by the following:
(1) Explosions, bursting of boilers, breakage of shafts, or any latent defect in the machinery or hull (excluding the cost and expense of replacing or repairing any defective part);
(2) Negligence of master, mariners, engineers, repairers or pilots; provided such loss or damage has not resulted from want of due diligence by the owner of the yacht or by the insured.

*873 EXCLUSIONS: This insurance does not cover:
(a) Any loss, damage or expense caused by wear and tear, gradual deterioration, weathering, moths, vermin, mold, marine life or unseaworthiness.
(b) Mysterious disappearance of equipment other than boats and launches.
(c) Any loss, damage or expense cause by freezing or by moving ice while moored or laid up afloat."
Standing alone Peril (b), which is a modified version of the "Inchmaree" clause[1] would afford coverage to plaintiff under the facts of this case since the hole in the muffler was a latent defect by whatever definition is afforded to the terms.
Were it not for the language of exclusion (a) above I would have no difficulty arriving at the conclusion reached by the majority, but I cannot do so without ignoring the plain language of the exclusion and the uncontradicted evidence presented by the defendant to support its defense thereunder.
The entire text of the perils insured under the policy and the exclusions is reproduced above to demonstrate that these policy provisions must be read together as they are given equal dignity under the format of the policy, and from the physical arrangement of the clauses within the policy it is apparent that the parties to the contract of insurance intended that the one section would be clearly modified and restricted by the other. The law is clear to the effect that where policy provisions are plain and unambiguous all such provisions must be given effect and in the application of this principle to Exclusion (a) I believe it is dispositive of the matter before us.
In my view when plaintiff rested, he had successfully borne his burden of proof and was entitled to recover under the perils insured, but defendant then carried its burden of proof to support its affirmative defense that this particular loss was excluded from coverage because it was caused by gradual deterioration of that muffler.
The only witness who ever visually inspected the hole in the muffler was Manuel Joseph Stroker, an employee mechanic of George Engine Co., Inc., employed by the plaintiff to repair his yacht. He gave the following description of the muffler:
"Well, it was an oval shaped muffler, it had an accentric center, diameter approximately 12 x 14 x 50 inches long. It was installed in the ship on a slight angle forward toward the bow the best of my remembrance, and the forward section if it lay near the bottom of the bilge and could be submerged in water should there be water in the boat. This area had rusted through or was eat out from oxidation, salt water. It was a water cooled maxim muffler. In order for the water to come in from the sea it had to eat through both walls of the muffler. The inner wall and the outer wall had to be ate through. I didn't divert too much attention to this particular item because it was of no interest to me. My assignment was to repair the engine and later during the same day or the following day I was ordered to change the muffler and I removed the muffler and
Q. Would you describe the hole that you mentioned you saw in the muffler? Did you see a hole in the muffler?
A. Yes. It had a hole in it and it had a rag stuffed in it. Now, the hole, the best I can remember, was not a very big hole, maybe a half-inch in diameter or less.
Q. What did it look like, what appeared to be the cause for the hole being there?
*874 A. Deterioration, it looked like a piece of metal that would just deteriorate from age, exposure to water or chemical."
The plaintiff makes much over the fact that this witness when shown the picture of the replaced muffler could not identify it, but this witness testified that from the time he performed this repair work on January 30, 1970, to the time of the trial on April 10, 1973, he had performed probably "thousands" of jobs. Undoubtedly many of these jobs involved mufflers which looked the same as, or at least similar to, the one he had installed over three years previously. Furthermore, defendant offered in evidence a copy of the original repair order completed by Stroker on January 30, 1970, but the trial judge sustained plaintiff's objection to the introduction of that document into evidence. Pretermitting the question of whether the document was admissible, the record shows that while Stroker was on the witness stand he was given the document by plaintiff's counsel to refresh his memory concerning the job he had done and the document is a part of the record before us. It contains after the words "Probable Cause of Failure:" a hand-written notation: "Hole rusted threw (sic) water-cooled muffler." This document served to corroborate Stroker's testimony.
The only evidence produced by plaintiff having any bearing on the question of whether this muffler was in fact worn out from wear and tear and gradual deterioration was plaintiff's testimony that when he had the muffler installed he was told that it would have a probable life of 2500 hours and since he had used it for only 1400 hours it should have lasted for another thousand hours or six or seven years. But this testimony was qualified by plaintiff to the effect that he was also told that it might last as little as five years, especially if used in the salt water of the Gulf or in excessively sandy waters. He testified that the yacht was used in Lake Pontchartrain "most of the time" the water of which he described as "brackish," meaning to this writer water that is at least somewhat salty. This muffler was installed in 1958, some 12 years before the loss in this case, and considering the uncontradicted testimony of Mr. Stroker I find that the cause of plaintiff's loss was the wear and tear on and the gradual deterioration of the muffler bringing into play the exclusion of the policy which would have otherwise covered the loss since the defect was indeed latent.
I respectfully dissent.
GULOTTA, Judge (concurring).
I concur with the result reached in the majority opinion. However, I view this matter as simply a question of whether the cause of the sinking, i. e., the hole in the muffler, resulted from a latent defect or from deterioration. If the hole was caused by latent defect, there is insurance coverage. If the hole resulted from deterioration, coverage is excluded.
It is clear from the testimony, as pointed out in the majority, that the sinking resulted from a latent defect. This is a question of fact resolved by the trial judge in favor of the plaintiff. The record, in my opinion, supports that conclusion.
Accordingly, I concur with the result affirming the judgment as amended.
NOTES
[1] One in which coverage attaches from the effective date and the risks are not limited to a given voyage, but to a certain fixed term or period of time. Black's Law Dictionary, 4th Ed.; 4A Appleman, Insurance Law and Practice, 1969 § 2656; Gulfstream Cargo, Ltd. v. Reliance Insurance Company, 409 F. 2d 974 (5th Cir. 1969). See: Union Insurance Co. of Philadelphia v. Smith, 124 U.S. 405, 427, 8 S.Ct. 534, 546, 31 L.Ed. 497, 506.
[2] Coverage under an all risks policy creates a special type of insurance. It extends coverage to risks not usually contemplated and avoids putting upon the insured the burden of establishing that the loss was due to a peril falling within the policy's coverage. The insurer can avoid coverage upon demonstrating that a specific provision expressly excludes the loss from coverage. 44 Am.Jur. 55 A.L.R. 941; 5A Appleman, Insurance Law and Practice, 1969 § 3251; Hughes v. Potomac Ins., Co., 199 Cal.App.2d 239, 18 Cal.Rptr. 650; Sun Insurance Office, Limited v. Clay, 133 So.2d 735, (Fla.1961); Redna Marine Corporation v. Poland, et al., 46 F.R. D. 81, 86 (U.S.D.C., S.D., N.Y.1969).
[3] Inaugurated to overcome the decision of the House of Lords in Thames & Mersey Marine Insurance Co. v. Hamilton Fraser & Co., 12 App.Cas. 484 (1887), it takes its name from the Steamship Inchmaree involved in that case. The origin and development of the Clause is interestingly traced in the Arbitration opinions of John C. Prizer, National Bulk Carriers, Inc., S. S. Pan Massachusetts v. American Marine Hull Insurance Syndicate, 1949 A.M.C. 340, and of Claude E. Wakefield, Thibert, Owner of the Diesel Tug Dusty v. Union Insurance Society of Canton, Ltd., 1951 A.M.C. 1661, and the fascinating opinion of Judge Carter in Ferrante v. Detroit Fire & Marine Insurance Co., 125 F.Supp. 621, 1954 A.M.C. 2026.

Tetreault, Francis L., The Hull Policy: The "Inchmaree" Clause, 41 Tulane Law Review 325 (1966).
[4] A hidden defect * * * not manifest, but hidden or concealed, and not visible or apparent; a defect hidden from knowledge as well as from sight; * * * a defect which reasonably careful inspection will not reveal; one which could not have been discovered by inspection * * * by any known and customary test.
[5] As to the distinction between the English and the American rule on the presence or absence of a warranty of seaworthiness in a time policy, see Saskatchewan Government Insurance Office v. Spot Pack, Inc., 242 F.2d 385 (5th Cir. 1957). Under the American Rule, a warranty of seaworthiness is implied as of the very moment of attachment of the insurance. Under the American Rule once the warranty is satisfied (as it clearly was here) the warranty thereafter becomes a modified "negative" one in which it is warranted that the owner, from bad faith or neglect will not knowingly permit the vessel to break ground in an unseaworthy condition.
[6] If the warranty is complied with at attachment, then the policy is effective and subsequent breachs merely suspend coverage until the breach is cured and the consequences of the breach are obliterated. Henjes v. Aetna Ins. Co., supra.
[1] For the complete text of this clause as of January 1, 1964, see "The Hull Policy: The Inchmaree Clause" by Francis L. Tetreault, 41 Tulane Law Review 325.