**Richard GREGOIRE, Plaintiff,**

v.

**UNDERWRITERS AT LLOYDS, COMBINED COMPANIES, et al., Defendants.**

**No. A 80–11 Civ.**

United States District Court, D. Alaska.

Jan. 20, 1982.

---

**68.** See Part II(B) *supra.*

Allen McGrath and Joan Travostino of Graham & James, Anchorage, Alaska, for plaintiff.

Richard L. Richmond of Richmond & Associates, Anchorage, Alaska, for defendants Underwriters at Lloyds, Combined Companies, Drake Ins. Co. Ltd., Le Assicurazioni D'Italia, Lloyd Italico & L'Ancora, and Mutuamar Societa'Di Assicurazioni Per Azioni.

Richard J. Riordan, Jr., of Bradbury, Bliss & Riordan, Inc., Anchorage, Alaska, for defendant Lyon De Falbe Intern. Ltd.

OPINION

FITZGERALD, District Judge.

On July 31, 1979, the F/V RENEGADE REX capsized and sank in moderate seas in Cook Inlet, Alaska. While early investigators of the sinking attributed it to the free surface effect, they also expressed some doubts as to its true cause. This uncertainty has remained a major source of contention between the parties.

At the time of the sinking, the RENEGADE REX was owned and operated by Richard Gregoire and covered by a time hull and machinery policy issued by defendant Underwriters in the amount of $300,-000. Mr. Gregoire filed an insurance claim within a few days of the sinking, and he maintains he was led to believe that payment would be made in a very short time. When no payment had been made by the beginning of December 1979, he filed a claim in state court to recover the insurance proceeds. The case was removed to this court where Mr. Gregoire moved for summary judgment. After the motion had been briefed, but before it could be argued, defendants agreed to pay the full $300,000, and it appeared that the action was settled.

On February 27, 1981, however, Gregoire was given leave to amend his complaint to state a cause of action for unreasonable and bad faith delay in payment which also sought punitive damages. This cause of action is now before me on cross-motions for summary judgment.[1]

Defendants initially claimed that the RENEGADE REX had capsized in calm seas. They argued that this created a presumption of unseaworthiness which, together with an implied warranty of seaworthiness alleged to exist in all marine insurance policies, justified their refusal to pay until they had finished their investigation of the cause of the REX's sinking. They have now abandoned their claim that the seas were calm and rely instead on evidence that

---

1. Plaintiff was subsequently given leave to amend his complaint to state a cause of action for breach of a policy provision calling for payment within three months of the filing of a claim. This issue has not been briefed by the parties and will not be considered here.

the REX was overloaded with crab pots when it left Homer and set out into Cook Inlet.

Mr. George James had done a stability survey on the RENEGADE REX in November of 1977. This survey provided for normal loading limits of 25 crab pots of 600 pounds each and for "extended loading limits" of 36 crab pots. The parties agree that at the time of the sinking the REX was carrying 32 crab pots but disagree on the meaning of the term "extended loading limits". Defendants claim that this term referred only to vessel movement within Homer harbor and other enclosed waters and that Mr. James had explained this to Mr. Gregoire. Therefore they conclude that when the REX proceeded into Cook Inlet with 32 crab pots aboard, she was in fact unseaworthy and that plaintiff was well aware of the condition. Plaintiff denies that the term had this meaning.

This aspect of the case presents three significant issues. The first two, whether the RENEGADE REX was unseaworthy when she left Homer harbor, and whether Mr. Gregoire knew she was unseaworthy, are factual questions that cannot be resolved on summary judgment. They involve, among other things, a careful consideration of the relative credibility of Mr. Gregoire and Mr. James. The third question, whether a warranty of seaworthiness is to be implied in every time hull and machinery policy is, however, a purely legal matter.[2]

Significant differences exist between voyage policies, which cover the risks of a designated voyage or voyages of uncertain duration, and time policies, which provide coverage for a designated interval. In a voyage policy, the owner of the vessel warrants the seaworthiness of his vessel at the time it sets out on the voyage. If the vessel is not seaworthy at this time, the entire policy is void and no recovery can be had under the policy even for losses not directly attributable to the lack of seaworthiness. Gilmore & Black, *The Law of Admiralty* § 2–6 (2d ed. 1975). The knowledge of the owner and his fault or lack of fault are both irrelevant. *Id.*

The rule of time policies is more complex and less certain. The English view is set out in Section 39(5) of the Marine Insurance Act of 1906:

In a time policy there is no implied warranty that the ship shall be seaworthy at any state of the adventure, but where, with the privity of the assured, the ship is sent to sea in an unseaworthy state, the insurer is not liable for any loss attributable to unseaworthiness.

This statute differs in two significant ways from the rule for voyage policies. First, the unseaworthy departure must occur with the knowledge and concurrence of the assured. The shipowner must have "knowledge not only of the facts constituting the unseaworthiness, but also knowledge that those facts rendered the ship unseaworthy, that is not reasonably fit to encounter the perils of the sea." *The Eurysthenes,* [1976] 2 All E.R. 243, 251.[3] Second, the statute does not, properly speaking, provide a warranty. In admiralty, warranties have their most strict meaning and act to void the policy. Gilmore and Black, *The Law of Admiralty,* § 2–6. Setting to sea in an unseaworthy state, however, does not void a time policy. It merely prevents recovery for those damages proximately caused by the unseaworthiness.

**2.** Both parties have devoted considerable energy to considering whether state or federal law should supply the grounds for deciding this question. Whether state or federal law is to be applied in construing marine insurance policies is a question of considerable difficulty. *Kalmbach, Inc. v. Insurance Co. of the State of Pennsylvania,* 529 F.2d 552, 554 (9th Cir.1976). Fortunately, it is not necessary to decide it here. Neither party has cited controlling precedent on the existence of the implied warranty of seaworthiness from either the State of Alaska or from the Ninth Circuit. In this situation, I am compelled to look at all relevant law, state and federal, in attempting to reach a decision. *Takahashi v. Loomis Armored Car Service,* 625 F.2d 314, 316 (9th Cir.1980); *Holcomb Construction Co. v. Armstrong,* 590 F.2d 811, 813 (9th Cir.1979).

**3.** *See also, Pacific Queen Fisheries v. Symes,* 307 F.2d 700, 712 (9th Cir.1962) (applying English law).

Cases in this country, most notably those from the Fifth Circuit, have spoken of an American rule in this area. The version of this rule most often cited is taken from *Saskatchewan Government Insurance Office v. Spot Pack, Inc.,* 242 F.2d 385, 388 (5th Cir.1957):

> [T]he American Rule, in a rare departure from a determined course of parallel uniformity, ... implies for a time policy, as does the English Rule as of the commencement of the voyage for voyage policies, ... a warranty of seaworthiness as of the very moment of attachment of the insurance. And, unlike, the English Rule which limits the warranty to the commencement of the voyage, the American Rule takes it somewhat further to extend, in point of time, a sort of negative, modified warranty. It is not that the vessel shall continue absolutely to be kept in a seaworthy condition, or even that she be so at the inception of each voyage, or before departure from each port during the policy term. It is, rather, stated in the negative that the Owner, from bad faith or neglect, will not knowingly permit the vessel to break ground in an unseaworthy condition. And unlike a breach of a warranty of continuing seaworthiness, express or implied, which voids the policy altogether, the consequence of a violation of this "negative" burden is merely a denial of liability for loss or damage caused proximately by such unseaworthiness.

This passage claims to set out two major differences between the English and American Rules.

1) Under the American Rule, the owner warrants absolutely the seaworthiness of his vessel at the time the policy attaches. This is the aspect of the implied warranty that has been most heavily criticized. *See, e.g.,* Gilmore and Black, *supra* § 2–6. I do not need to consider this warranty here, however, since the Underwriters concede that the REX was seaworthy at attachment.

2) The owner's duty of care to ensure the seaworthiness of the vessel at the time it breaks ground. Most of the confusion surrounding this second part of the American Rule springs from the ambiguous language "the Owner, from bad faith or neglect, will not knowingly permit the vessel to break ground in an unseaworthy condition." 242 F.2d at 388. The unfortunate juxtaposition of "neglect" and "knowingly" leaves it unclear whether the standard being proposed requires actual knowledge of the unseaworthy condition of the vessel by the owner as in the English Rule, or whether the owner's mere negligence is enough. Later language in the *Spot Pack* opinion, however, makes it clear that it is the English position that is being adopted.

> In such a Time policy, it is only " * * * where, with the *privity of the assured,* the ship is sent to sea in an unseaworthy state [that] the insurer is not liable for any loss attributable to unseaworthiness." (emphasis in original)

242 F.2d at 390. The "departure from a determined course of parallel uniformity" between the English and American Rules with respect to the owner's duty to assure the seaworthiness of his vessel after attachment lies therefore not in a difference between the English and American Rules for time policies, which are in fact the same, but between the English Rule for voyage policies and the American Rule for time policies.[4]

The other cases cited by the parties are not inconsistent with this position. In *New York, New Haven, and Hartford Railroad Co. v. Gray,* 240 F.2d 460 (2d Cir.1957), the trial court had found that the employees of a barge owner had been grossly negligent in loading a barge and that this had been the proximate cause of the barge capsizing. After finding that the damage was caused by a "peril of the sea", the appeals court considered a claim that the negligence of

---

**4.** This conclusion is buttressed by the language of *Spot Pack* itself. "[U]nlike the English Rule which limits the warranty to the commencement of the *voyage,* the American [for time policies] Rule takes it somewhat further." 242 F.2d at 388 (emphasis supplied).

the employees had been a breach of an implied warranty of seaworthiness and rejected it on the basis that the policy in question was a time policy. The court also considered the English Rule but found it unnecessary to rule on its applicability since it found that the vessel had not been sent to sea when the accident occurred.

Two years after *Spot Pack,* the Fifth Circuit again considered this question in *Tropical Marine Products v. Birmingham Fire Insurance Co. of Pennsylvania,* 247 F.2d 116 (5th Cir.1957) *cert. denied,* 355 U.S. 903, 78 S.Ct. 331, 2 L.Ed.2d 260 (1957). It reaffirmed its previous position but stated the rule as being that "the owner or those in privity with him will not knowingly send the vessel to sea in a deficient condition." 247 F.2d at 119. The opinion also cited *Gray* as upholding the same rule. *Id.*

The decision of the District Court for the Eastern District of Louisiana in *Lemar Towing, Inc. v. Fireman's Fund Insurance Co.,* 352 F.Supp. 652 (E.D.La.1972), *aff'd,* 471 F.2d 609 (5th Cir.1973), *cert. denied,* 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973), may be to the contrary. Here, the court found that the captain and crew of the vessel TRUDY B were incompetent and that this rendered the TRUDY B unseaworthy. It further found that the incompetence was due to the negligence of the owner and held that this breached the owner's implied warranty of seaworthiness. The actual statement of the implied warranty in *Lemar Towing,* however, is that "[t]o escape liability by way of this contention the underwriter must prove that the shipowner had knowledge of this unseaworthy condition, if in fact it did exist, and that said condition was the proximate cause of the loss." *Id.* at 660. Furthermore, in *D.J. McDuffie, Inc. v. Old Reliable Fire Insurance Co.,* 1979 A.M.C. 595 (E.D.La.1977) *aff'd,* 608 F.2d 145 (5th Cir.1979) *cert. denied,* 449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 35 (1980), the same district court stated the rule as being that "the insured owner will not knowingly or in bad faith allow the

vessel to go to sea in an unseaworthy condition." *Id.* at 598. *Lemar Towing* was affirmed by the Fifth Circuit without opinion, so there is no way of knowing whether its use of a negligence standard has been approved by that circuit. To the extent that *Lemar Towing* adopts such a standard, however, I find that it is based on a misreading of prior precedent and decline to follow it.

Most of the state court cases dealing with the implied warranty of seaworthiness deal only with the warranty at attachment and are not relevant to this case. *J.M. Corbett Co. v. Insurance Co. of North America,* 1979 A.M.C. 1510, 1513 (Cir.Ct.Cook County Ill.Law Div.1959); *Walker v. Travelers Indemnity Co.,* 289 So.2d 864, 870 (La.App. 1974); *Fisch v. Insurance Co. of North America,* 44 N.J.Super. 416, 130 A.2d 891, 892 (N.J.Super.Ct.App.Div.1957); *Zillah Transportation Co. v. Aetna Insurance Co.,* 175 Minn. 398, 221 N.W. 529, 530 (Minn. 1928); *Plummer v. Insurance Co. of North America,* 114 Me. 128, 95 A. 605 (Me.1915). The New York Court of Appeals considered the continuing duty of seaworthiness in *Berwind v. Greenwich Insurance Co.,* 114 N.Y. 231, 21 N.E. 151 (1889) and apparently approved a negligence standard. The policy in *Berwind,* however, contained an express exclusion for unseaworthiness and the statements of the court about the implied warranty are therefore dicta. *King v. Liverpool & London & Globe Insurance Co.,* 37 Misc.2d 822, 238 N.Y.S.2d 799 (1964) adopts the dicta in *Berwind* without analysis. I do not find it persuasive authority.

■ The Supreme Court has stated that efforts should be made in the area of marine insurance to preserve the uniformity between English and American law. *Standard Oil Co. of New Jersey v. United States,* 340 U.S. 54, 59, 71 S.Ct. 135, 138, 95 L.Ed. 68 (1950); *Queen Insurance Co. of America v. Globe & Rutgers Fire Insurance Co.,* 263 U.S. 487, 493, 44 S.Ct. 175, 176, 68 L.Ed. 402 (1924). Since the great majority of the decided cases in this country are

consistent with the English Rule, it should be applied in this case. I, therefore, hold that in a time hull policy of marine insurance there is no implied warranty that a vessel will not break ground in an unseaworthy condition. Where, however, the owner of a vessel or those in privity with him send their vessel to sea knowing it to be unseaworthy, the insurer is not liable for damages proximately caused by the unseaworthiness.

■ Resolution of this issue does not allow me to grant summary judgment for either party. Significant factual questions remain concerning whether the ship was in fact unseaworthy and, if it was, whether Mr. Gregoire knew this. Even if it were to be conceded that Mr. Gregoire had not breached the policy, plaintiff would still be required to establish that the Underwriters' delay in making payment was unreasonable. This also is a question of fact that must await determination at trial.

Defendants have also requested that the claim for punitive damages be dismissed. The appropriateness of punitive damages will depend upon facts to be developed at trial. A motion to dismiss this claim is therefore premature.

Plaintiff's and defendants' cross-motions for summary judgment are therefore both DENIED.

ORDERED ACCORDINGLY.