## THE CARIB PRINCE.

WUPPERMANN v. THE CARIB PRINCE. MIDDLETON et al. v. SAME.

CARDENAS et al. v. SAME. GILLESPIE et al. v. SAME.

(Circuit Court of Appeals, Second Circuit. May 28, 1895.)

1. SHIPPING — DAMAGE TO CARGO — SEAWORTHINESS — EXCEPTIONS IN BILL OF LADING.

Exceptions in a bill of lading of injuries arising from "latent defects in hull," etc., include a latent and undiscovered defect in a rivet which existed at the commencement of the voyage, and therefore limits the implied warranty of seaworthiness, if due diligence has been exercised. 63 Fed. 266, affirmed.

2. SAME—VALIDITY OF EXCEPTIONS IN BILL OF LADING.

The act which prohibits owners of vessels transporting merchandise to or from ports of the United States from limiting by bill of lading or otherwise their obligation to exercise "due diligence properly equip, man, provision, and outfit said vessel, and to make said vessel seaworthy and capable of performing her intended voyage" (Act Feb. 13, 1893, § 2; 27 Stat. 445), does not prevent the owner from relieving himself from the rigidity of the implied warranty of seaworthiness by stipulating against liability for loss by latent defects, provided he uses due diligence at the commencement of the voyage to make the vessel seaworthy.

Appeal from the District Court of the United States for the Eastern District of New York.

These four libels against the steamship Carib Prince were filed respectively by Josephine W. Wupperman, Clifford L. Middleton and others, Manuel Cardenas and another, and William Gillespie and others, to recover for damage to cargo. The district court dismissed the libels. 63 Fed. 266. The libelants appeal.

George A. Black, for libelants.

J. Parker Kirlin, for respondents.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge. These four actions were brought by cargo owners to recover from the British steamship Carib Prince the damages which a part of her cargo received on a voyage from Granada to New York, which commenced about August 31, 1893. The bills of lading, which were signed in Trinidad, a port governed by English law, excepted the ship from liability for injuries arising from "latent defects in hull, tackle, boilers, and machinery." The vessel was a new steel steamer, of 2,500 tons dead weight capacity, built in the spring of 1893, at Sunderland, England, by experienced builders. She was "constructed with a water tank of iron in her peak, one side of which was formed by a bulkhead. The tank, when she sailed from Granada, was empty, but during the voyage from Granada to New York it was filled with water one afternoon, in order to trim the vessel," and the next morning, or the morning after, the tank was found partially empty, and investigation showed that the head had come off from one of the rivets riveting the side of the bulkhead next to the hold, and leaving a hole through which

water had poured upon the libelants' merchandise stowed near the bulkhead. The rivet was the end rivet in a series which attached a transverse "knee tie" to the bulkhead on the inside of the tank. The testimony clearly showed that abundant diligence was used in the construction of the vessel, that the defect in the rivet was a latent one which occurred at the time of the vessel's construction, which was not discovered and was not discoverable, at that time or subsequently, by the exercise of all the known and customary tests and methods of examination, which were all employed; that it was a latent and undiscovered defect in the hull of the vessel at the commencement of the voyage from Trinidad; that, consequently, the vessel was not at said time seaworthy; and that the injury occurred solely through this unseaworthiness, and not by reason of filling the tank injudiciously.

The main question in the case is whether the bills of lading expressly or clearly limited the implied and absolute warranty of seaworthiness, which is that the ship was in fact seaworthy at the commencement of the voyage, and is a warranty against latent, unknown, and not discoverable defects. The Edwin I. Morrison, 153 U. S. 199, 14 Sup. Ct. 823; The Caledonia, 157 U. S. 124, 15 Sup. Ct. 537; The Glenfruin, 10 Prob. Div. 103. The recent case of The Caledonia, supra, declared that exemptions in bills of lading which limit the extent of this implied warranty must be expressed in clear terms, or they will be construed strongly against the shipowner, and consequently held that an exemption which excluded loss or damage from defects in steam boilers and machinery did not mean defects existing at the commencement of the voyage, and therefore did not protect the owner from liability for unseaworthiness. The bills of lading in these cases exclude losses arising from latent defects in the hull, and the question is whether this language does not necessarily mean defects existing at the time of shipment, and, therefore, whether it does not clearly, and even expressly, exclude unseaworthiness arising from such defects.

The only case in which the effect of an exemption of "latent defects" is discussed is The Laertes, 12 Prob. Div. 187, but in that case the language of the bill of lading was "latent defects  *  *  * even existing at time of shipment," so that the intention of the parties to limit the implied warranty was manifest. In the cases at bar it is urged that latent defects must necessarily mean those existing at the time of shipment, and that any other construction is exceedingly strained. A defect, in order to be latent, must have been not discoverable at the time of the shipment. It could not, in its nature, have been capable of discovery then and have become capable of evading discovery subsequently. A construction which should say that latent defects meant those only which had become latent since the vessel left the wharf, and could not mean previously existing defects, savors of the distinctions of the schoolmen; and, if latent defects existing upon the voyage are exempted, those existing at the time of the shipment are included, for they are the same. We concur with the experienced district judge that the exception "limits the warranty which the law would otherwise im-

ply that the ship was seaworthy at the beginning of the voyage, and exempts the ship if due diligence is exercised by the owner."

It is insisted by the libelants that the second section of the act of Feb. 13, 1893 (27 Stat. 445), commonly known as the "Harter Act," prohibits any clause in a bill of lading which limits the implied warranty of seaworthiness. The section is as follows:

"Sec. 2. That it shall not be lawful for any vessel transporting merchandise or property from or between ports of the United States of America and foreign ports, her owner, master, agent, or manager, to insert in any bill of lading or shipping document any covenant or agreement whereby the obligations of the owner or owners of said vessel to exercise due diligence properly equip, man, provision, and outfit said vessel, and to make said vessel seaworthy and capable of performing her intended voyage, or whereby the obligations of the master, officers, agents, or servants to carefully handle and stow her cargo and to care for and properly deliver the same, shall in any wise be lessened, weakened, or avoided."

Waiving the question whether this section applies to a foreign contract entered into by owners who are foreigners, the section does not bear the construction placed upon it by the libelants, which is that a comma shall be inserted after the word "diligence," and that the clause respecting seaworthiness shall be read as a prohibition of any covenant or agreement whereby the obligations of the owner of said vessel to make said vessel seaworthy, etc., shall in any wise be lessened. The language of the section, as passed by the house of representatives, permits this construction, but in the senate the words "exercise due diligence" were inserted prior to the words "properly equip," and the evident intent of the section as amended, and the effect of the amendment, were to prohibit covenants whereby the obligation of the owners to exercise due diligence to properly equip, man, provision, and outfit the vessel, and to make her seaworthy, should be lessened. A like amendment was inserted in the third section, which provided that, if the owner exercised due diligence to make the vessel seaworthy, he should not be responsible for damage resulting from subsequent faults in navigation. These amendments indicate the intent which ran through the act as it left the senate, and make it plain that one design of the act as amended was to permit the owner to relieve himself from the rigidity of the warranty of seaworthiness, but not to permit him to lessen his obligation to exercise due diligence in all respects at the inception of the voyage.

The claimant endeavored to show that the cause of the injury was an error of the master in filling the tank at sea, and that, therefore, the owner was protected by the third section of the Harter act; but, as the injury did not arise from an error in the management of the vessel, an examination of this section is unnecessary.

The decrees of the district court are affirmed, with costs.