## FRANKLIN FIRE INS. CO. v. ROYAL MAIL STEAM PACKET CO.

District Court, S. D. New York.

Nov. 2, 1931.

Single & Single, of New York City (Robert E. Hill and C. Welmore Robinson, both of New York City, of counsel), for libelant.

Slayton & Jackson, of New York City (G. Noyes Slayton, of New York City, of counsel), for respondent.

ROBERT P. PATTERSON, District Judge.

This suit is brought to recover for damage to cargo. Coffee which was being carried by the respondent on the steamship Singleton Abbey from Haiti to Antwerp was damaged by water. The libelant, which had insured the cargo owner, paid the loss, and thereby became the owner of the claim against the carrier.

The coffee was taken on board at Port au Prince and Petit Goave, Haiti, in the latter part of December, 1926. It was stowed in a hold located behind the forepeak tank, the collision bulkhead separating them. On January 21, 1927, the ship left St. Thomas, the last port of call, bound for Antwerp. Rough weather was immediately encountered, and, on the 22d, the forepeak tank was filled with sea water to steady the ship. After three or four days of rather strong winds and head seas, during which the ship pitched and strained heavily, the weather moderated on the 26th and 27th. On the 28th, it was discovered that the well in the hold where the coffee was stowed contained over four and a half feet of water. The water had leaked into the hold from the forepeak tank. Investigation showed that seven rivets connecting the plating of the collision bulkhead to a horizontal stiffener had become loose, and that four more rivets were missing altogether. It was through these that the water had flowed into the hold. The rivets were not rusty or worn, nor was there any sign of deterioration around the holes.

The evidence showed that in November, 1926, the Singleton Abbey had been surveyed by a Lloyd's surveyor at Rotterdam, the survey being her special No. 3 survey, and had undergone considerable repairs to her forepeak tank. The tank was then tested by water under pressure and declared to be tight. The ship was classed 100 A 1. Straightway after the survey, she had gone to the West Indies with a general cargo and had run into rough weather on the voyage down. It was on the return voyage that the damage occurred. No tests of the forepeak tank were made before loading cargo for the return voyage. The only inspection at that time, so far as this part of the ship was concerned, was a general view of the hold, to see that it was dry and in good condition.

The bill of lading issued by the carrier exempted it from liability for damage caused by perils of the seas or by unseaworthiness, provided "all reasonable means" were taken to render the ship seaworthy. Those are the clauses relied upon by the carrier to defeat the suit.

The Harter Act (46 USCA §§ 190–195) has no direct bearing, since the carriage was exclusively between foreign ports. Presumably the British law, if proved, would control the case, although the facts bearing upon this phase of the matter have not been developed. There being no proof as to what the British law is, I am bound to decide the case according to the law of the United States. The Montana, 129 U. S. 397, 444–446, 9 S. Ct. 469, 32 L. Ed. 788. Under the policy of our law, which is reflected by the Harter Act, there can be no doubt as to the validity of the two exceptions referred to, perils of the seas and unseaworthiness; the latter exception being conditioned upon the use of due diligence to provide against unseaworthiness.

The carrier's argument that the damage came about from perils of the seas need not detain us. The heavy head seas doubtless caused a straining which the rivets in the bulkhead were too weak to withstand. In this sense, it may be proper to say with the carrier that the sea did the damage. The

time when the loosening took place was probably two or three days before the discovery of water in the hold. But at no time was the weather unusual for the season of the year. It falls far short of a peril of the seas, which is an expression commonly understood in our maritime law to refer only to storms of extreme violence. The Rosalia (C. C. A.) 264 F. 285; The Edith (C. C. A.) 10 F.(2d) 684.

I think, however, that there is merit in the carrier's contention based upon due diligence to render the vessel seaworthy. The requirement is of course that due diligence be used to make the ship seaworthy at the commencement of the voyage. International Navigation Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 21 S. Ct. 591, 45 L. Ed. 830. As things turned out, she evidently was not in fact seaworthy in respect to her collision bulkhead; the rivets between the plating and the stiffener yielded under a strain which they should have resisted successfully. But it seems to me that "all reasonable means" had been used to render the ship seaworthy. She had been thoroughly surveyed less than two months before commencing this voyage. Repairs had been made to the forepeak tank and an approved test of it had been carried out. The tank had been found to be tight, and the ship had been graded as in first class condition. No breakage had occurred on the voyage down. It would be going too far, in my opinion, to require that the forepeak tank be tested again in Haiti, less than two months after the special survey and tank test in Rotterdam. I will not undertake to specify the point of time at which the special survey and testing of the tank would lose their force; but it seems clear that under the circumstances presented here the survey and test were so recent that the failure to repeat the test at Haiti was not a lapse by those in charge of the ship. There is no rule of law that every bolt must be hammered, every bulkhead tested, before each voyage.

On the facts, the case resembles The Carib Prince (D. C.) 63 F. 266, affirmed in (C. C. A.) 68 F. 254, where it was held that due diligence had been exercised. The reversal in the Supreme Court (170 U. S. 655, 18 S. Ct. 753, 42 L. Ed. 1181) did not disturb this finding. See, also, The Ontario (D. C.) 106 F. 324, affirmed in (C. C. A.) 115 F. 769. These cases are closer to this situation than are The Leerdam (D. C.) 8 F.(2d) 295, affirmed in (C. C. A.) 17 F.(2d) 586, and other authorities cited by the libelant.

The libel will be dismissed, with costs.