147 So.2d 200 (1962)
RELIANCE INSURANCE COMPANY, Appellant,
v.
William A. BRICKENKAMP, Appellee.
No. 3076.
District Court of Appeal of Florida. Second District.
November 21, 1962.
Rehearing Denied December 20, 1962.
*201 G. Morton Good, of Smathers & Thompson, Miami, for appellant.
William Gundlach and Floyd V. Hull, Jr., of Anderson; Gundlach & Hull, Fort Lauderdale, for appellee.
SHANNON, Chief Judge.
This is an appeal by the defendant from a final judgment entered upon a jury verdict holding the defendant liable on a policy of marine insurance. The appellant-defendant had issued a policy of marine insurance to the appellee-plaintiff wherein, among other things, was contained a clause which is in controversy here. The clause defined the risk insured against as:
"This insurance also to cover, subject to the special terms of this policy, loss of and/or damage to hull or machinery through the negligence of master, mariners, engineers, or pilots, or through explosions, bursting of boilers, breaking of shafts, or through any latent defect in the machinery or hull provided such loss or damage has not resulted from want of due diligence by the owners of the vessel, or any of them, or by the manager." (Emphasis added).
Apparently the insured boat had been used only about twenty hours when it sank in the vicinity of Fort Lauderdale, Florida. The record shows that prior to its use that day the exhaust pipe of the vessel could be seen protruding through the transom and that water could be seen issuing therefrom. Within approximately one-half hour the plaintiff observed smoke coming out of the hatch and immediately pulled the vessel into a canal, where it sank.
The facts in the case are not disputed and so we will cite from the appellant's brief the cause of the accident as:
"* * * It was found that the rubber hoses between the exhaust elbows and the pipes going out of the transom of the boat were burned in half, allowing water to enter the hull. The holes in the rubber exhaust hoses were caused by the loss of cooling water circulation to the engine, which, in turn, resulted from a water pump failure, which failure was caused as a result of the drive belt slipping. The cause of the belt slippage was a maladjustment of the generator, which adjustment draws the belt tight on the water pump. The generator is mounted on a swivel bolt and can be swung in an arc to either tighten the belt or to loosen it. Once the generator is properly positioned and the belt is properly tensioned, a second bolt on the generator is tightened to hold it in its proper place. There was nothing physically or mechanically wrong with the water pump, with the engine, with the generator, or with the belt, and the only difficulty was that the generator was improperly adjusted, which permitted the belt to be too loose and thereby slip on the water pump, causing a shortage of cooling waters to the engine, and consequently overheating of the exhaust gases and the burning of the exhaust hoses."
The plaintiff and the defendant both put on expert witnesses as to the cause of the damage, but the essence of their testimony is encompassed within the statement which we have quoted. The defendant made a motion for directed verdict at the conclusion of all the testimony; the motion was *202 denied; and thereafter the jury found against it.
Both the appellant and appellee have divided the questions presented to us into several categories, but, as we see it, there is one question that is determinative of the whole issue, and that is whether or not under the facts of this case the cause of loss came from a latent defect in the machinery or hull, within the meaning of those terms as used in the marine policy of insurance. In other words, was the improperly tensioned water pump drive belt a latent defect in the machinery or hull, or was it not?
As is stated in Friedman v. Virginia Metal Products Corp., Fla. 1952, 56 So.2d 515, 33 A.L.R.2d 956:
"It is a cardinal rule, that the construction of all written instruments, is a question of law and belongs to the courts, provided: `the language used is clear, plain, certain, undisputed, unambiguous, unequivocal and not subject to conflicting inferences'. * * *"
That the language in the policy is unambiguous and unequivocal cannot be gainsaid. The question involved here is not an analysis of the language of the policy but is, rather, whether or not the facts in the case fit into the clause set out above.
In Waterman S.S. Corp. v. United States S.R. & M. Co., C.C.A. 5, 1946, 155 F.2d 687, the court stated:
"* * * `A latent defect is one that could not be discovered by any known and customary test.'[9]
"[9]. The Bill, D.C.Md. 1942, 47 F. Supp. 969, 978, affirmed Lorentzen v. Brazil Oiticica, Inc., 4 Cir., 1944, 145 F.2d 470.
"`A comparative local weakness must be based upon some visible defect in the material, or should be shown under a test to be fairly pronounced, in order to indicate that bursting was not due to wear and tear or inevitable depreciation, rather than to what can be termed a latent defect in any workable sense.'[10]
"[10]. Mellon v. Federal Insurance Co., D.C.S.D.N.Y., 1926, 14 F.2d 997, 1000.
"A true latent defect is not a gradual deterioration but is a defect in the metal.[11] The ship owner has the burden
"[11]. The Bill, supra, 47 F. Supp. at page 978.
of showing that the latent defect was not discoverable.[12]
"[12]. The Toledo, D.C.E.D.N.Y. 1939, 30 F. Supp. 93, 99 affirmed 2 Cir., 1941, 122 F.2d 255, certiorari denied Isbrandtsen-Moller Co. v. The Toledo, 1941, 314 U.S. 689, 62 S.Ct. 302, 86 L.Ed. 551."
The law dealing with "latent defect in machinery or hull" has been fairly uniform. In the case of Ferrante v. Detroit Fire & Marine Insurance Co., D.C., 1954, 125 F. Supp. 621, it is stated:
"On examination of the evidence, we found no latent defect existed. Defendants' expert testimony on the subject of latent defects was unsatisfactory and the manufacturer's report contradicted this testimony. From the evidence we found that the shaft failure and entire engine damage was proximately caused by negligence of the engineer in failing properly to lubricate the engine, and in failing to observe the symptoms of inadequate or improper lubrication which were or should have been apparent to a competent engineer. * * *"
The condition which ultimately caused the sinking of the vessel in the instant case was not a latent defect, but it was, as shown by the record, one that was difficult to see or to find. If the condition had been on deck it would have been seen readily, but merely because it was difficult of ascertainment does not draw it into the category of a latent defect.
The defendant below moved for directed verdict at the conclusion of all the testimony *203 and we think that the trial judge erred in refusing to so direct.
Reversed.
SMITH, J., concurs.
WHITE, J., dissents.
WHITE, Judge (dissenting).
The subject of plaintiff's loss was a new eighteen-foot boat powered by an inboard motor and insured inter alia against negligent operation and latent structural and mechanical defects under a comprehensive type policy issued by the defendant-appellant. The policy provision pertinent to this case insured the plaintiff against loss "through any latent defect in the machinery or hull" not resulting from want of due diligence of the owner or manager. At the time of the loss the boat had been operated a total of approximately twenty hours.
Expert testimony traced the plaintiff's loss to a maladjusted or misaligned generator. This caused a slipping of the belt which operated the water pump. Resultant malfunctioning of the water pump produced excessive heat, fire, leakage and sinking of the boat.
A latent defect has been defined as one which is not ascertainable by known customary test. The majority opinion cites this definition with approval but does not apply it from the standpoint of the insured owner or purchaser. In some contexts latent defects have been defined also as those which could have been discovered had due diligence been exercised. See The Carib Prince, 2 Cir., 68 F. 254. In this connection it would seem that due diligence is that care which an ordinary owner or purchaser would exercise under the circumstances  not the care that would be expected of a trained factory technician or skilled mechanic. Cf. 23 Fla.Jur., Negligence, § 19. In order to come fully within the definition of "latent" the defect must be hidden from knowledge as well as sight. Smith v. Morrow, 230 Ill. App. 382; Words and Phrases, "Latent Defect." Apparently it was found in the trial court that the misaligned or maladjusted generator was a part of the machinery insured, that the defect existed at the time of the purchase and was not apparent to the insured through observance of the customary test with reference to the functioning of the water pump. The applicable customary test was described by expert witness Hugh G. Dent, Jr.:
"Q. What would be the customary test which you would perform yourself to determine whether or not the water pump was operating before you used the boat?
"A. Well actually the only test you can tell is by starting the engine up and observe the water coming out the exhaust.

"Q. And if you observe water coming out of the exhaust what would that indicate to you?
"A. You would assume your water pump is functioning.
"Q. Is that the only test you would perform yourself?
"A. Yes sir." (Emphasis added)
The described test was in fact applied by the insured and the water ejecting through the transom indicated that the water pump was functioning.
This case differs from The Phoenicia, 2 Cir., 90 F. 116, cited and argued in appellant's brief. In that case a new ship took on a large amount of water due to an opening around a porthole. The leak was caused by a bent ring which prevented the porthole from closing completely. The defect was held not latent as it would have been discovered had the known customary test been applied, but such test was not applied. The court said at page 118:
"It is evident that if at the time of sailing the port was loose and leaky, as *204 when found on January 25th, a leak so near the water line would render the steamer unfit for the carriage of cargo in that compartment, and that the loss should be charged to the ship. Nor could such a defect, if it then existed, be regarded as a `latent defect'; because it was easily discoverable upon inspection by the water test; a test which is easily made, and which according to the evidence is customarily made, and which reasonable prudence requires to be made, as respects ports so near the water line * * *. Had either the water test or the chalk test been applied, there is no doubt that if any defect in this port then existed, it would have been discovered; and if it had been proved by any such test that no leak was then discoverable, no reasonable doubt would have remained that the defect arose upon the voyage, and thus the chief difficulty in the case would have been removed." (Emphasis added)
In the instant case, as previously stated, the pertinent test was observed and the flow of water through the exhaust indicated proper functioning of the pump.
The conclusion reached by the majority appears to hinge on the assumption that if the engine had been positioned above deck the defect certainly would have been discovered by the plaintiff. In my opinion, however, the evidence was sufficient to support the conclusion that the defect could well have been missed even if the engine were above deck and completely within the plaintiff's vision. The question of whether the defect pre-existed the sale of the boat or was supervenient to the purchase was one to be decided by the trier of facts in the light of the evidence adduced; and the issue of whether the insured would or should have discovered the defect under either circumstance was a question on which reasonable men might differ.
A misplacement or maladjustment of parts, as well as an inherent flaw in structural material, may constitute a mechanical defect. Black's Law Dictionary, 3rd Ed., "Defect In Machinery." Expert witness Hugh G. Dent, Jr. testified that the maladjusted generator was a defect in the machinery that could have existed when the boat was originally checked out or in the factory when the engine was constructed. In view of the newness of the boat and the short period of its operation, the trying authority reasonably could have found, as the judgment indicates, that the machinery was latently defective when the boat was purchased, that the plaintiff exercised ordinary care in observing known customary tests, and that an actual view of the part itself would not have put him on notice of any defect.
I would affirm.