474 So.2d 239 (1985)
Miguel JAAR and George Jaar, As Personal Representatives of the Estate of Salim Jaar, Deceased; Paola Jaar, a Minor; Roberto Jaar, a Minor; and Marcos Jaar, a Minor, by and through Their Guardians and Next Friends, Miguel Jaar and George Jaar, Appellants,
v.
The UNIVERSITY OF MIAMI, C. Gillon Ward, M.D., Alejandro Soler, M.D., Craig Lovett, M.D., Scott McFarland, M.D., Public Health Trust of Dade County D/B/a Jackson Memorial Hospital, Appellees.
No. 83-485.
District Court of Appeal of Florida, Third District.
February 12, 1985.
Rehearing Denied September 10, 1985.
*240 Daniels & Hicks and Mark Hicks, George, Hartz, Burt & Lundeen, for appellants.
Fowler, White, Burnett, Hurley, Banick & Strickroot and Henry Burnett, Thompson, Parenti & Falk and Michael Parenti, Miami, for appellees.
Before SCHWARTZ, C.J., and BASKIN and FERGUSON, JJ.
BASKIN, Judge.
The estate and children of Salim Jaar [Jaar] appeal judgments entered in favor of the University of Miami [University], a doctor on its medical school faculty, and three residents at Jackson Memorial Hospital, absolving them of liability for negligent medical care administered to Jaar at the hospital. In addition, appellants contest the application of sovereign immunity, limiting the amount recoverable from the Public *241 Health Trust of Dade County d/b/a Jackson Memorial Hospital [the Trust] and totally relieving the doctors of liability. Upon review of the record, we hold that the University is liable for the negligent medical care administered by the residents under the supervision of the doctor, a University employee working at the hospital pursuant to a contract between the University and the Trust. We find no error in the application of the sovereign immunity statutes.
Jaar was admitted to the hospital's burn unit as a private, paying patient for treatment of burns on his hands and toes. Dr. C. Gillon Ward was the attending physician in charge of Jaar's care. Jaar suffered the burns as a result of a fire at his home in Haiti. One of Jaar's children died in the fire, and Jaar's wife died while undergoing treatment for injuries sustained during the fire. Because Jaar's surviving children were receiving treatment for severe burns at the hospital, and Jaar wished to be with them, he was admitted to the hospital for treatment of his relatively minor burns. On a Sunday morning, three medical residents decided to remove the dead skin from Jaar's hands; neither Dr. Ward nor an anesthesiologist was present. Unfortunately, the residents administered an excess amount of anesthetic and, after lingering in a coma, Jaar died.
The personal representatives of Jaar's estate and his children filed an action to recover for Jaar's wrongful death. They sued the Trust, Dr. Ward, the three residents who administered the anesthetic, and the University. They included the University in the action because Dr. Ward was a member of its medical school faculty and worked at the hospital pursuant to a contract between the University and the Trust. Pursuant to the contract, Dr. Ward treated patients, served as head of the hospital burn unit, and supervised residents. In response to the complaint, the Trust admitted that Dr. Ward and the three residents he supervised were its employees or agents and were acting within the scope of their employment or agency at the time of the incident. The hospital, Dr. Ward, and the residents admitted that Jaar received negligent care.
At the conclusion of plaintiffs' case, the trial court directed a verdict in favor of the three residents on the ground that as employees or agents of the Trust, they were afforded immunity under section 768.28(9)(a), Florida Statutes (Supp. 1980). The trial court submitted for jury determination interrogatories questioning whether Dr. Ward and the residents were also acting as employees or agents of the University. The jury found that Dr. Ward and the three residents were not employees or agents of the University when they treated Jaar, and pursuant to the verdict, the trial court entered judgments in favor of Dr. Ward and the University. The jury also returned a verdict of $2,000,000 against the Trust. The trial court limited appellants' recovery from the Trust to the $100,000 maximum permitted under the applicable sovereign immunity statute, section 768.28(5), Florida Statutes (1979).[1] Having determined that Dr. Ward and the residents were not employees or agents of the University, the jury, in accordance with the court's instructions, did not reach the question whether the University was an agent of the Trust and thus entitled to sovereign immunity protections.
Appellants contend that the trial court erred in submitting to the jury questions pertaining to the agency or employment relationships of the doctors, the University, and the hospital. They claim that they are entitled to a directed verdict against the University, arguing that, as a matter of law, the doctors were acting within the scope of their employment with the University at the time of the incident. In addition, they challenge the sovereign immunity protections afforded Dr. Ward and the residents. We address these issues in turn.
*242 As to the first point, we find merit in appellants' argument that the trial court erred in submitting to the jury the issue of Dr. Ward's relationship to the University at the time of the incident. Our review of the record and applicable case law reveals, as a matter of law, that Dr. Ward was an employee or agent of the University, working within the scope of that employment or agency relationship at the time of the incident.
The existence and scope of an agency relationship are generally questions of fact to be resolved by the factfinder, Dade County Police Benevolent Association v. City of Homestead, 444 So.2d 465, 471 (Fla. 3d DCA 1984), unless the evidence is susceptible of only one interpretation. Amerven, Inc. v. Abbadie, 238 So.2d 321 (Fla. 3d DCA 1970). See Eberhardy v. General Motors Corp., 404 F. Supp. 826 (M.D.Fla. 1975). However, the evaluation of employment contracts and employment status is a question of law to be resolved by the trial court. Sosa v. Knight-Ridder Newspapers, 435 So.2d 821 (Fla. 1983) (news carrier who had employment contract with newspaper and was killed in accident while soliciting subscriptions as part of subscription contest was, as matter of law, employee of paper working within scope of employment at time of accident); Phillips v. Unicare Amelia Island, 458 So.2d 50 (Fla. 1st DCA 1984) (plaintiff injured on employer's premises when she returned, several days after resigning, to pick up paycheck was, as matter of law, employee on date of accident).
Furthermore, the construction of a written document, such as the contract before us, presents a question of law, Peacock Construction Co. v. Modern Air Conditioning, 353 So.2d 840, 842 (Fla. 1977); Quayside Associates v. Harbour Club Villas Condominium Association, 419 So.2d 678 (Fla. 3d DCA 1982), if its language is clear and unambiguous. Friedman v. Virginia Metal Products Corp., 56 So.2d 515, 516 (Fla. 1952); Reliance Insurance Co. v. Brickenkamp, 147 So.2d 200, 202 (Fla. 2d DCA 1962). The existence of a clear and unambiguous contract is the best evidence of the intent of the parties, and its meaning and legal effect are questions of law for determination by the court. Innkeepers International v. McCoy Motels, 324 So.2d 676, 678 (Fla. 4th DCA 1975), cert. denied, 336 So.2d 106 (Fla. 1976).
The contracts between Dr. Ward and the University and between the University and the Trust set forth the duties and obligations of the parties and define their legal relationships. Dr. Ward is employed by the University as a full-time medical faculty member.[2] The University assigned Dr. Ward to head the hospital's burn unit pursuant to the terms of contracts between the University and the Trust.[3] The contracts require the University to provide medical care to hospital patients and to supervise residents in their treatment of patients.[4]
*243 The University assumes additional responsibility in the treatment and care of fee paying patients.[5] The indemnification clause contained in the contract provides Trust indemnification of the University for claims arising out of the treatment of nonpaying patients.[6] Conversely, the indemnification clause establishes the parties' intent to delegate sole responsibility to the University for the care of paying patients, such as Jaar.
Based upon our review of the clear and unambiguous language contained in the contract and its apparent objectives, we conclude, as a matter of law, that Dr. Ward served as an employee and agent of the University.[7]See J & S Coin Operated Machines v. Gottlieb, 362 So.2d 38 (Fla. 3d DCA 1978). There is no question that at the time the tragic incident occurred, Dr. Ward was acting in accordance with the duties he assumed under the express and intertwining terms of his contracts with the University and the University's contracts with the Trust. Dr. Ward's care of Jaar and his supervision of the residents constituted the type of conduct both he and the University were obligated to perform. Thus, the University is liable for the negligent acts of its agent, Dr. Ward, see Weiss v. Jacobson, 62 So.2d 904 (Fla. 1953); Stinson v. Prevatt, 84 Fla. 416, 94 So. 656 (Fla. 1922); Weiss v. Culpepper, 281 So.2d 372 (Fla.3d DCA 1973), cert. denied, 290 So.2d 62 (Fla. 1974), and appellants are entitled to a directed verdict against the University as a matter of law.
There is additional support for our holding that the University is liable for Dr. Ward's negligence. An employer may not escape liability by delegating performance of its contractual duties to its employees or to an independent contractor. Irving v. Doctors Hospital of Lake Worth, 415 So.2d 55 (Fla. 4th DCA), review denied, 422 So.2d 842 (Fla. 1982) (where emergency room physician negligently treated patient, failure to instruct jury that hospital may not escape contractual liability to provide emergency room care by use of independent contractor-doctor is error); Mills v. Krauss, 114 So.2d 817 (Fla. 2d DCA 1959), cert. denied, 119 So.2d 293 (Fla. 1960). The *244 University, having contracted with the Trust to provide medical care to hospital patients, remains liable for negligent acts performed by its employee in executing its contract obligations. For these reasons, we hold that the trial court erred in submitting the question of Dr. Ward's relationship with the University to the jury rather than deciding the issue as a matter of law.
Next we turn to the questions involving the application of the sovereign immunity statutes. The jury returned a verdict against the Trust for $2,000,000. Because the Trust is a state agency, the trial court was correct in limiting its liability to $100,000 pursuant to section 768.28(5), Florida Statutes (1979).[8]
The Trust admitted that the doctors were its employees or agents and that their negligent treatment of Jaar was performed within the scope of their employment. As employees or agents of the Trust, Dr. Ward and the residents are entitled to immunity from liability. § 768.28(9)(a), Fla. Stat. (Supp. 1980).
This statute provides:
No officer, employee, or agent of the state or its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injuries or damages suffered as a result of any act, event, or omission of action in the scope of his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. The exclusive remedy for injury or damages suffered as a result of any act, event, or omission of an officer, employee, or agent of the state or any of its subdivisions or constitutional officers shall be by action against the governmental entity, or the head of such entity in his official capacity, or the constitutional officer of which the officer, employee, or agent is an employee, unless such act or omission was committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. The state or its subdivisions shall not be liable in tort for the acts or omissions of an officer, employee, or agent committed while acting outside the course and scope of his employment or committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.
We find no merit in appellants' argument that due process and equal protection considerations preclude the application of sovereign immunity to shield the doctors from liability in this cause. Florida courts have ruled the immunity statute constitutional when applied to a physician who, within the scope of his governmental employment, negligently caused injury to another. Bryant v. Duval County Hospital Authority, 459 So.2d 1154 (Fla. 1st DCA 1984); White v. Hillsborough County Hospital Authority, 448 So.2d 2 (Fla. 2d DCA), cause dismissed, 443 So.2d 981 (Fla. 1983).
The next issue presented for determination is whether sovereign immunity *245 applies to limit the University's liability for the negligent acts of Dr. Ward. An employer or principal is vicariously liable for negligent acts of its employee or agent committed within the course and scope of that employment or agency relationship, Weiss v. Jacobson; Stinson; Weiss v. Culpepper, and two or more persons acting as joint employers may both be held liable for injuries attributable to an employee. Hollis v. School Board of Leon County, 384 So.2d 661 (Fla. 1st DCA 1980).
Where, as here, the employer is a state agency, the immunity from liability which attaches to a principal extends to the acts of its agents which are within the scope of their employment. § 468.28(9)(a), Fla. Stat. Thus, the sovereign immunity which limits the liability of the Trust shields the doctors. On the other hand, the immunity which attaches to an agent does not revert to its principal. The University receives no sovereign immunity protection from the doctors' relationships to the Trust. See May v. Palm Beach Chemical Co., 77 So.2d 468 (Fla. 1955) (although public policy precluded wife from suing husband for injuries caused by his negligent driving, husband's principal not derivatively immune from liability); Hamburger v. Henry Ford Hospital, 91 Mich. App. 580, 284 N.W.2d 155 (1979) (hospital not derivatively immune from liability for torts of its servant-doctor who was immune under Good Samaritan Statute); 55 A.L.R. 1197, 1198-99 (1928) cited in McWain v. Greyhound Lines, 357 So.2d 780 (Fla. 3d DCA 1978) (private employer who employs police officer to maintain order on premises not immune from liability because of employee's official status for injuries caused by negligent acts committed by officer within performance of duties owed to private employer); Restatement (Second) of Torts § 217(b)(ii) (1965).
The University would be immune only if it were an agent of the Trust. The relationship between the University and the Trust is created by the clear and unambiguous terms of their contracts which, as a matter of law, demonstrate the absence of an agency relationship between them. The University and the Trust are two independent entities joined for the purpose of providing health and medical services to the public.[9] Section 1 of the BAA, entitled "Autonomous Nature of Public Health Trust," and ensuing sections specify that neither party acts as agent for the other.[10] In addition, the contract provisions render each party liable for its proportionate share of the parties' joint expenses, and demonstrate the parties' intent to refrain from entering an agency relationship. See, e.g., § IV(A), BAA.
The legislative purpose in enacting sovereign immunity statutes is to protect the public from "profligate encroachments on the public treasury." Spangler v. Florida State Turnpike Authority, 106 So.2d 421, 424 (Fla. 1958); Berek v. Metropolitan Dade County, 396 So.2d 756, 758 (Fla. 3d DCA 1981). The University is a private non-profit educational institution. Any liability it incurs for the *246 negligence of its employees has no effect on the public treasury. Thus, the University is not entitled to benefit from sovereign immunity protections. Cf. Sibley v. Board of Supervisors, 446 So.2d 760 (La. Ct. App. 1983), aff'd, 462 So.2d 149 (La. 1985) (liability limitation applied to action brought against state university for negligent treatment of patient by resident at university associated hospital).
In summary, we hold that the unambiguous terms of the contracts between the University and the Trust, and between Dr. Ward and the University, establish, as a matter of law, that Dr. Ward acted as an agent of both the University and the Trust at the time of the incident. Although sovereign immunity statutes limit the liability of the Trust to $100,000 and shield the doctors from all liability, they afford the University no protection.
For these reasons, we reverse the judgment in favor of the University and direct that a judgment be entered against the University. We affirm the remaining judgments.
Remanded with directions.
Before SCHWARTZ, C.J., and BARKDULL, HENDRY, HUBBART, NESBITT, BASKIN, DANIEL S. PEARSON, FERGUSON and JORGENSON, JJ.

ON MOTION FOR REHEARING EN BANC
PER CURIAM.
The court, having heard argument on rehearing en banc, adheres to the panel opinion issued February 12, 1985, and denies appellee University of Miami the relief sought.
SCHWARTZ, C.J., and HENDRY, HUBBART, BASKIN and FERGUSON, JJ., concur.
BARKDULL, Judge, dissenting.
I respectfully dissent. I would grant the rehearing en banc and affirm the judgment on the jury verdict in favor of the University of Miami. The question of agency is normally a jury question. Cirou v. Basler, 432 So.2d 628 (Fla. 3d DCA 1983); Bernstein v. Dwork, 320 So.2d 472 (Fla. 3d DCA 1975); Financial Fire & Casualty Company v. Southmost Vegetable Cooperative Association, 212 So.2d 69 (Fla. 3d DCA 1968). It was properly submitted to the jury under the issues as framed in the pleadings. Parsons v. Reyes, 238 So.2d 561 (Fla. 1970); Bruce Construction Corp. v. The State Exchange Bank, 102 So.2d 288 (Fla. 1958); Gravette v. Turner, 77 Fla. 311, 81 So. 476 (1919); Levey v. Getelman, 444 So.2d 1027 (Fla. 3d DCA 1984); Ranger v. Avis Rent-A-Car System, Inc., 336 So.2d 467 (Fla. 3d DCA 1976). In Parsons v. Reyes, supra, at page 563 the Supreme Court said:
"... It does not lie within the province of the Court to weigh evidence or determine questions of credibility and, where there is the possibility of different conclusions or inferences from the evidence the Court should submit the issue to the jury... ."
In Gravette v. Turner, supra, 81 So. at page 477 (which was quoted with approval in Bruce Construction Corp. v. The State Exchange Bank, supra) it was stated as follows:
"... Where there is room for a difference of opinion between reasonable men as to the proof or facts from which an ultimate fact is sought to be established, or where there is room for such differences as to the inferences which might be drawn from conceded facts, the court should submit the case to the jury for their finding, as it is their conclusion, in such cases, that should prevail, and not primarily the views of the judge... ."
In Levey v. Getelman, supra, the court stated:
"... Where evidence is conflicting, or will admit of different reasonable inferences, the issue should be submitted to the jury as a question of fact, and not passed upon by the judge as a matter of law...."
Finally in the case of Ranger v. Avis Rent-A-Car, Inc., supra, this court said:

*247 "... Further, it is not within the province of the trial judge to weigh evidence or determine questions of credibility, and where there is the possibility of different conclusions or inferences from the evidence, the judge should submit the issue to the jury... ."
This and other appellate courts have many times held that if there is sufficient, competent evidence to support a jury verdict, an appellate court should not substitute its judgment for the jury's verdict.[1]Bermil Corporation v. Sawyer, 353 So.2d 579 (Fla. 3d DCA 1978); Howe v. Estate of Howe, 349 So.2d 1200 (Fla. 1st DCA 1977); Fountainhead Motel, Inc. v. Massey, 336 So.2d 397 (Fla. 3d DCA 1976); Warfield v. Sparks, 203 So.2d 63 (Fla. 1st DCA 1967); White v. Acker, 155 So.2d 176 (Fla. 1st DCA 1963). In the case of Bermil Corporation v. Sawyer, supra, this court in dealing with the question stated:
"... Initially, it must be emphasized that all three final judgments under attack were rendered pursuant to a jury verdict. As such, certain appellate principles of law must be emphasized and cannot, sub judice, be understated. Those principles include the caveat that the function of an appellate court is not to substitute its judgment for that of the jury on disputed questions of fact ..."
In Howe v. Estate of Howe, supra, the court held:
"... While that testimony as to intent is in conflict with the testimony of the attorney who prepared the agreement, it was the jury's province to resolve the conflict... . The credibility of the testimony and the weight of the evidence are for the jury's determination. It is not the province of the court to substitute its judgment on factual issues for that of the trier of the facts ..."
This court in Fountainhead Motel, Inc. v. Massey, supra, stated:
"... [I]t is not the function of an appellate court to substitute its judgment for that of the jury on disputed questions of fact. On appeal from an adverse judgment after a jury verdict, an appellate court must view the record and all reasonable inferences therefrom in the light most favorable to the appellee... ."
The First District Court of Appeal in Warfield v. Sparks, supra, in recognition of this principle said that:
* * * * * *
Since this is an action at law, in which action the issues of fact are to be determined by a jury, it is not the privilege of a trial or an appellate court to weigh and consider the evidence as though the judges had been empaneled as the members of the jury, and substitute our judgment on the factual issues for that of the actual jury. Our only function as to such issues is to decide whether there was sufficient competent, substantial evidence at the trial from which the jurors as reasonable men could have concluded as they did, even though we, if we had been sitting in the jury box, might have reached a different conclusion.
* * * * * *
Finally in White v. Acker, supra, the court stated that:
"... The jury's function is to judge the credibility of the witnesses and conflicting evidence, and this it did. It is not the function of the court to substitute its judgment on evidentiary matters for that of the jury. As stated by Judge Allen, speaking for the Second District Court of Appeal in Andrews v. Cardosa [97 So.2d 43 (Fla.App. 2d, 1957)]: `... The test is not what an Appellate Court would have decided had they tried the case, but whether or not they can say, after viewing the case, that the jury as reasonable men could not have found the verdict which they did ...'"
The panel opinion holds, as a matter of law, that Dr. Ward was an employee of the University of Miami. This overlooks the fact that the contract between the University of Miami and the Trust is subject to *248 the interpretation that Dr. Ward was an employee of the Trust,[2] at best the contract may be ambiguous and therefore the contract could be subject to two different interpretations. In such event, the manner in which the parties interpreted the contract *249 *250 becomes of utmost importance. Blackhawk Heating & Plumbing Co., Inc. v. Data Lease Financial Corp., 302 So.2d 404 (Fla. 1974); Welsh v. Carroll, 378 So.2d 1255 (Fla. 3d DCA 1979); American Agronomics Corporation v. Ross, 309 So.2d 582 (Fla. 3d DCA 1975). The parties by their actions over the years have treated persons, such as Dr. Ward, as being employed by the Trust and this was admitted in the pleadings. In this case the jury put their stamp of approval on the party's interpretation and with substantial competent evidence in the record this court should not interfere with the jury's decision. Therefore, I would affirm the final judgment in all respects.
NESBITT, DANIEL S. PEARSON and JORGENSON, JJ., concur.
NOTES
[1] The statute currently in effect, § 768.28(5), Fla. Stat. (1983), permits a maximum recovery of $200,000 for multiple claims arising out of the same incident.
[2] See contract entitled Regular Appointment-Probationary, dated May 26, 1980, signed June 19, 1980, and contract entitled Medical School Supplement to Faculty Appointment, dated May, 1980, date of signing illegible.
[3] The Trust, as operator of the hospital, and the University work together under two agreements: the Basic Affiliation Agreement [BAA] and the Annual Operating Agreement [AOA]. The BAA sets forth the duties and responsibilities of the parties. The AOA is the annual operational agreement which deals with fiscal matters and defines the administrative provisions of the BAA.

Section I of the AOA states that "the names of physicians employed by the University and to be provided by the University to deliver designated health care services in the facilities under jurisdiction of the Trust are included as Addendum I." Dr. Ward is listed in addendum I as an attending physician in the burn unit. He later became director of the burn unit.
[4] The contracts between the Trust and the University provide:

[The University] [s]hall, through members of its faculty who have medical staff appointments, provide professional medical care for all patients of the Trust, including inpatients, outpatients, and emergency patients. The Trust shall pay [to the University] the reasonable costs of the faculty-staff members supervising the house staff [including residents] in the care of such patients.
§ IV(E)(1), BAA.
.....
[The University] [s]hall, through its faculty, assist in and share the responsibility for the establishment of uniform high standards of medical care, be accountable to the Trust for the administration of such standards of medical care, and assist the Trust in the general management and supervision of operations and the training of house staff.
§ IV(E)(4), BAA.
.....
[T]eaching and patient care shall at all times be carried on and supervised by members of the faculty of the Medical School.
§ IV(C), BAA.
.....
The University shall be responsible for assigning faculty as requested by the Trust to provide administrative and supervisory services at Jackson Memorial Hospital.
Addendum I, AOA.
[5] According to the contract:

[The University] [s]hall, through the medical School faculty appointed to the Medical Staff, and in accordance with the policies of the Trust, admit and care for professional fee income patients in hospital beds or clinics specified by the Trust.
§ IV(E)(6), BAA.
[6] The indemnification clause states:

Each party agrees to be liable for the activities of its respective trustees, officers, employees, agents and students (collectively herein referred to as "Personnel") and to indemnify and hold harmless the other party and its personnel from all claims, suits, judgments or damages arising out of the activities of itself, or its own personnel except that the Public Health Trust shall indemnify and protect the University, its voluntary faculty and its personnel as to any claims which arise out of treatment of non-paying patients. (emphasis supplied)
§ VI, BAA.
[7] Cf. Bryant v. Duval County Hospital Authority, 459 So.2d 1154 (Fla. 1st DCA 1984) (staff physician at county hospital not employee of private corporation which provides doctors to hospitals and provides billing services for physicians where no evidence that corporation involved in selecting or hiring physician, that corporation had power to dismiss him or that corporation had right of control over his conduct); McWain v. Greyhound Lines, 357 So.2d 780 (Fla. 3d DCA 1978) (question of fact whether police officer working as security guard for private company acted as officer or employee in assaulting bus patron).
[8] § 768.28(5) provides:

The state and its agencies and subdivisions shall be liable for tort claims in the same manner and to the same extent as a private individual under like circumstances, but liability shall not include punitive damages or interest for the period prior to judgment. Neither the state nor its agencies or subdivisions shall be liable to pay a claim or a judgment by any one person which exceeds the sum of $50,000 or any claim or judgment, or protions thereof, which, when totaled with all other claims or judgments paid by the state or its agencies or subdivisions arising out of the same incident or occurrence, exceeds the sum of $100,000. However, a judgment or judgments may be claimed and rendered in excess of these amounts and may be settled and paid pursuant to this act up to $50,000 or $100,000, as the case may be, and that portion of the judgment that exceeds these amounts may be reported to the Legislature, but may be paid in part or in whole only by further act of the Legislature. The limitations of liability set forth in this subsection shall apply to the state and its agencies and subdivision whether or not the state or its agencies or subdivisions possessed sovereign immunity prior to July 1, 1974.
[9] The contract states:

The parties do hereby agree to affiliate and to cooperate for their mutual benefit in the operation of the Medical Center in order to accomplish the following purposes:
(1) The provision of a single high quality standard of health and medical services to the public.
(2) The provision of medical education, research and service.
§ IV(A), BAA.
[10] The BAA states:

The University of Miami  Jackson Memorial Medical Center shall be a term describing the aforesaid resources and activities, and shall not constitute an entity having any legal obligations, powers or authority of any kind or nature whatsoever, but is a designation and mechanism through this affiliation and any other agreements to provide continuing coordination of activities to achieve the most effective service to the community and the best possible development of medical teaching and research.
§ III(A), BAA.
It is agreed that nothing contained in this agreement is intended to or shall be construed to constitute a delegation of any of the authority or responsibility of the Public Health Trust or the University of Miami.
§ VII, BAA.
[1] The deceased came to the hospital administered by the Trust because of its burn unit. The deceased did not know Dr. Ward, did not know he was going to be treated by Dr. Ward.
[2] The BASIC AFFILIATION AGREEMENT BETWEEN PUBLIC HEALTH TRUST AND UNIVERSITY OF MIAMI reads in part as follows:

"THIS AGREEMENT made and entered into this / day of June 1976, by and between the Public Health Trust of Dade County, Florida, (sometimes hereinafter referred to as the "Trust"), an agency and instrumentality of Dade County, which operates Jackson Memorial Hospital, and the University of Miami, (sometimes hereinafter referred to as the "University").
WITNESSETH
WHEREAS, the Public Health Trust is a public body corporate and politic and an agency and instrumentality of Dade County created and existing under the Laws of the State of Florida, which operates, maintains, and governs Jackson Memorial Hospital (sometimes hereinafter referred to as the "Hospital"), a facility which provides essential primary, secondary, and tertiary medical care to all people of Dade County as well as to non-residents of the County.
* * * * * *
I. AUTONOMOUS NATURE OF PUBLIC HEALTH TRUST
The Public Health Trust, as provided by its enabling legislation, is the sole governing body for Jackson Memorial Hospital and all other facilities within its jurisdiction. In that capacity the Public Health Trust is required by law and shall exclusively exercise all powers of operation and governance, including but not limited to:
(1) The establishment and implementation of policy for Jackson Memorial Hospital and the performance of all obligations, including the execution of all policies, established for the Trust by ordinances or resolutions of the Board of County Commissioners.
(2) Increasing efficiencies of operation of the Hospital.
(3) Improving the quality and availability of hospital services in an institution providing a single high standard of medical care and meeting the standards of accreditation of the Joint Commission on Accreditation of Hospitals, Residents Review Committees, Medicare and Medicaid.
* * * * * *
(5) Establishing rates and charges, except fees for professional services, with the exception of those professional services mutually agreed to by the parties and specified in the annual operating agreements hereinafter referred to in Article IV-I for all persons or organizations using the facilities of or receiving care or assistance from the Hospital and collecting all monies owed pursuant to such rates and charges.
(6) Appointing physicians and chiefs of services and determining the extent of their rights to practice on or with the Medical Staff of the Hospital subject to the current Bylaws, Rules and Regulations of the Medical Staff of the Hospital, dated September 3, 1974; provided, however, the Trust retains the right to amend such bylaws, rules and regulations, subject to consultation with the University. In the event either party desires to change said bylaws, rules and regulations in a fashion unsatisfactory to the other, then the differences between the parties shall be submitted to the Medical Center Committee herein established for consideration and recommendations to the respective Boards of Trustees.
(7) Determining any and all activities and the manner of their performance which shall take place in the Hospital and prescribing all bylaws, rules and regulations necessary to govern such activities; and further determining which persons, in any capacity whatsoever, shall work in the Hospital. All properly identified University employees shall be considered acceptable to work in the facilities of the Trust; provided however that the Trust may refuse to accept any individual for reasonable cause.
* * * * * *
D. RIGHTS AND DUTIES OF THE PUBLIC HEALTH TRUST
In addition to all other rights and duties set forth herein, the trust:
* * * * * *
(7) Shall provide all facilities needed for the adequate care of patients including facilities for professional fee income patients (Patients who are obligated to pay all hospital charges and a professional fee for physician services) and shall provide reasonable space and facilities for chiefs of services and other members of the Medical Staff needed for their teaching, for research, and for administrative duties in their capacity as responsible medical supervisors for the Trust.
* * * * * *
F. MEDICAL STAFF
The Trust shall retain and exercise the final authority in the appointments, reappointments, revocations, amendments to and suspensions of practicing privileges and of membership upon the medical staff or staffs and chief of services in the facilities within the jurisdiction of the Trust. All such authority shall be exercised in accordance with the procedures prescribed by the Trust in the Bylaws, Rules and Regulations of the Medical Staff of Jackson Memorial Hospital and shall include reasonable consultation with the Medical School.
* * * * * *
G. CHIEFS OF SERVICE
The chiefs of clinical services of Medical Staff of Jackson Memorial Hospital and other Trust facilities shall be appointed in the manner prescribed by the Trust and set forth in the Bylaws, Rules and Regulations of the Medical Staff of Jackson Memorial Hospital. The Dean of the University of Miami School of Medicine shall make nominations for the chiefs of clinical services, and in so doing shall act upon the recommendations of a joint search committee, appointed by the Dean, which is representative of both parties to the agreement.
* * * * * *
Each chief of service appointed hereunder shall have the authority to direct and shall be accountable for all professional and administrative activities within his service and shall be so accountable to the Trust through the Chief Executive Officer and the President of the Medical Staff of Jackson Memorial Hospital, for his responsibilities and duties as required by the Bylaws, Rules and Regulations of the Trust, dated September 3, 1974, or as said Bylaws, Rules and Regulations may be amended by the Trust. The chiefs of services, in their capacity as members of the faculty of the Medical School shall be accountable to the Dean of the Medical School for their responsibilities as faculty members of the School.
* * * * * *
I. ANNUAL OPERATING STATEMENT
The parties agree that they shall annually enter into an operational agreement which shall set forth the fiscal and administrative provisions for carrying out this basic affiliation agreement from year to year."
* * * * * *
The ANNUAL OPERATING AGREEMENT BETWEEN PUBLIC HEALTH TRUST AND UNIVERSITY OF MIAMI reads in part as follows:
"THIS AGREEMENT, made and entered into this 28 day of Oct, 1980, by and between the Public Health Trust of Dade County, Florida, (sometimes hereinafter referred to as the "TRUST") an agency and instrumentality of Dade County, which operates Jackson Memorial Hospital and the University of Miami, a corporation not-for-profit organized and existing under the laws of Florida (sometimes hereinafter referred to as the "UNIVERSITY").
* * * * * *
WITNESSETH
WHEREAS, the Trust and the University entered into a Basic Affiliation Agreement (sometimes hereinafter referred to as the "Agreement") dated June 1, 1976, which among other provisions, identified the University of Miami-Jackson Memorial Medical Center (sometimes hereinafter referred to as the "Medical Center"), and
WHEREAS, said Agreement provides the parties shall annually enter into an operational agreement setting forth the fiscal and administrative provisions for carrying out said Basic Agreement.
NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained, the sufficiency of said consideration being hereby acknowledged, the parties hereto do agree as follows:
1. CHIEFS OF SERVICE
The Chiefs of Clinical Services of the Medical Staff of Jackson Memorial Hospital shall be appointed and removed as prescribed in the Bylaws, Rules and Regulations of the Medical Staff of Jackson Memorial Hospital. The names of the physicians who will serve in this capacity during the effective period of this Annual Agreement and a table of organization including other physicians employed by the University and to be provided by the University to deliver designated health care services in the facilities under jurisdiction of the Trust are included as Addendum I.
Each Chief of Service appointed shall have the authority to direct and shall be accountable to the Trust through the Chief Executive Officer and the President of the Medical Staff of Jackson Memorial Hospital, for his responsibilities and duties as required by the Bylaws, Rules and Regulations of the Medical Staff of Jackson Memorial Hospital, dated September 3, 1974, or as said Bylaws, Rules and Regulations may be amended by the Trust. The Chiefs of Services, in their capacity as members of the faculty of the Medical School shall be accountable to the Chief Executive Officer of the Medical School for their responsibilities as faculty members of the School.
* * * * * *
III. PUBLIC HEALTH TRUST PHYSICIANS
The Trust agrees to employ physicians to supplement faculty. The names, services assigned and salaries are listed in Addendum I appended hereto.
* * * * * *
ADDENDUM I
SCHEDULE OF FACULTY REIMBURSEMENT, CHIEFS OF SERVICES AND PHYSICIANS DELIVERING DESIGNATED SERVICES
The University shall be responsible for assigning faculty as requested by the Trust to provide administrative and supervisory services at Jackson Memorial Hospital. The positions filled to discharge the responsibilities will be by Florida licensed physicians. Each physician so assigned shall be responsible for delivery of administrative and supervisory services of divisional activities assigned to him/her by the Chief of Service and as agreed to by the Trust.
The names of physicians assigned the responsibility of rendering services are listed below. In the event it becomes necessary to replace a physician the University shall promptly notify the Trust. Changes will be made with the concurrence of the Trust. If there is a vacancy in any position for a period of at least thirty (30) calendar days, a pro-rated deduction of payment may be made until the vacancy has been filled.
* * * * * *
Compensation for the delivery of the designated health care services shall be as set forth below. Physicians listed are those delivering health care services for said compensation.
* * * * * *
DEPARTMENT OF SURGERY
* * * * * *
Attending, Burn Unit, Gillon Ward, M.D. 25,000" (Emphasis added)
* * * * * *